JOHN M. H. BURGETT *et al.*

*v.*

FRANK S. OSBORNE *et al.*

*Opinion filed April 21, 1898.*

1. APPEALS AND ERRORS—*reversal of decree on facts is not warranted unless findings are clearly erroneous.* Findings of fact by the chancellor on conflicting evidence of witnesses who testified in open court will not be disturbed on appeal, unless clearly against the preponderance of the evidence.

2. CONVEYANCES—*party claiming deed to be a mortgage has burden of proof.* One asserting that a deed absolute in form was intended as security for a debt must sustain his claim by clear and convincing evidence.

3. SAME—*law presumes that deeds are what they purport to be.* While a deed absolute in form may be shown by parol evidence to have been intended as a mortgage, yet the law presumes, until clear contrary proof is adduced, that the deed is an absolute conveyance.

4. MORTGAGES—*an obligation to be secured is essential to a mortgage.* One seeking to show that a deed absolute in form was intended as a mortgage must prove that an obligation existed between the parties to the deed which that instrument was intended to secure.

5. SAME—*when title will not be deemed to be in the nature of a mortgage.* Title acquired by the purchase of a certificate of sale at the request of the mortgagor, and a master's deed thereon, will not be considered as in the nature of a mortgage, where, at the time of such purchase, the mortgagor's period of redemption had expired and no indebtedness existed between him and the purchaser.

6. CONTRACTS—*contracts of purchase and re-sale are sustained when made in good faith.* A party may purchase land for another and bind himself to convey the land to the one at whose instance it was purchased, on payment of an agreed price at a certain time; and such a transaction will be sustained when made in good faith and not tainted with usury or fraud.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. JOHN BARTON PAYNE, Judge, presiding.

This is a bill, filed in the Superior Court of Cook county on December 24, 1895, by the appellant, John M.

H. Burgett, against the appellant, Patrick H. Heffron, and the appellees, Henry S. Osborne, Frank S. Osborne, Henry R. Pebbles and Nelson D. Parkhurst. Subsequently, on motion of Louise N. Osborne, the wife of Frank S. Osborne, she became, by leave of court, a party defendant to the cause. The bill alleges, that, on June 18, 1895, the appellant, Burgett, and the appellee, Henry S. Osborne, recovered a judgment by confession against Patrick H. Heffron for $100,000.00 damages and $13.00 costs; that execution was issued upon said judgment and returned unsatisfied; and that the same remains in full force and effect. The bill then alleges that, under the decree of foreclosure rendered against said Heffron as hereinafter stated, a master's certificate of sale was issued to the purchaser at the foreclosure sale; that said master's certificate of sale was assigned to the appellee, Frank S. Osborne, and, there being no redemption, that a master's deed was subsequently issued to said Frank S. Osborne. The bill further alleges, that said Osborne purchased the certificate of sale, and took out the deed, for the benefit of said Heffron; that said Frank S. Osborne holds the title to the premises, named in said certificate and deed, as security for the amount paid out by him for the purchase of the said certificate of sale for said Heffron, and also as security for the payment of the said judgment. The bill prays, that the premises may be sold for the payment of the amount, claimed to be due from said Heffron to said Frank S. Osborne, and for the payment of the amount due under said judgment. Answers were filed to the bill by all the defendants thereto. A cross-bill was filed by Frank S. Osborne and Louise N. Osborne, his wife, to which cross-bill answers were filed by said Burgett, Henry S. Osborne, Heffron, Pebbles and Parkhurst.

The Superior Court rendered a final decree in favor of the cross-complainants, holding that the purchase of the certificate of sale, above referred to, was made by Frank S. Osborne as trustee of his wife Louise N. Osborne; that

said Louise N. Osborne was the absolute owner of the leasehold interest, sold under said decree, and in the lots hereinafter described, and that Heffron and Burgett and the other defendants to the cross-bill should be forever barred of all interest in said property or its proceeds, except that the right to purchase said property, within certain times hereinafter mentioned, was granted by said decree to said Heffron and said Burgett. An appeal was taken from the decree so rendered to the Appellate Court, and the decree was there affirmed. The present appeal is prosecuted from the judgment of affirmance entered by the Appellate Court.

The facts, necessary to be stated in order to understand the questions involved, are substantially as follows: On May 1, 1883, Henry Keep and Albert Keep owned lots 14, 15, 16 and 17 in block 115 in school section addition to Chicago, each owning an undivided half thereof. On that day, each of them executed to the Chicago Open Board of Trade a lease for his undivided one-half interest in said lots for a term of ninety-six years, beginning May 1, 1883, and ending April 30, 1979. In 1884 and 1885 the Chicago Open Board of Trade leased the east eighty feet of said lots 15 and 16, fronting on Clark street in said city, to the said Heffron for the term ending April 30, 1979. In the next year, it leased to him nine feet and eleven inches of said lots 15 and 16 just west of said eighty feet of said lots for the same term. In 1887 said corporation deeded to the said Heffron all its interest in said four lots 14, 15, 16 and 17, acquired by it through the leases from said Henry and Albert Keep. The four lots in question form a strip of land fronting one hundred feet and six inches on Clark street, and extending westward two hundred and fifteen feet to Pacific avenue where the frontage is the same as on Clark street. The open board of trade, before the transfer in 1887 to Heffron, had erected upon said lots 14 and 17 a seven-story office building, containing seventy-five office rooms above the first floor, known

as the Open Board building. This building passed to
Heffron by the conveyance above named, and has a front-
age of one hundred feet and six inches on Pacific avenue
and a depth of one hundred feet. Between April 30, 1886,
and July 1, 1888, Heffron erected on said lots 15 and 16,
fronting on Clark street one hundred feet and six inches,
and having a depth of eighty-nine feet and eleven inches,
an eight-story and basement brick building, containing
two hundred and forty guest rooms above the first floor,
besides five rooms designed to be rented for stores on
Clark street, which building is known as the Gore Hotel
building. Between said Open Board building and said
Gore Hotel building is a court twenty feet wide. The Gore
Hotel building was erected by Heffron under an agree-
ment with James J. Gore, whereby the latter was to have
a certain interest in the leasehold estate in said lots 15
and 16 and said hotel building. In April, 1888, Heffron,
under an agreement with Gore, bought a large amount of
furniture and placed the same in said hotel building, and
opened and conducted an hotel business therein.

On October 17, 1887, Heffron executed to Horace A.
Hurlbut a deed of trust of that date, conveying his lease-
hold interest in said lots 15 and 16 to secure a certain
indebtedness, amounting to $125,000.00. Subsequently,
Isabella S. Gardner and Elizabeth S. Paton, the owners
of the indebtedness secured by said trust deed to Hurl-
but, filed a bill in the Superior Court of Cook county to
foreclose said trust deed; and obtained a decree of sale
therein on December 22, 1893. Under said decree, the
master in chancery sold the premises on March 19, 1894,
to Horace E. Hurlbut for $146,747.15, and executed to said
Horace E. Hurlbut a certificate of sale for said leasehold
estate in said lots 15 and 16. The master's certificate,
thus issued to Horace E. Hurlbut, is the certificate, which
was purchased by the appellee, Frank S. Osborne, and
the circumstances of which purchase will be more fully
explained hereafter.

The Chicago Open Board of Trade, before its transfer of the leasehold estate in said lots 14 and 17, executed a trust deed thereon to one Orson Smith to secure an indebtedness of $125,000.00. On November 10, 1888, said Heffron and said Gore executed a trust deed to Lyman J. Gage, trustee, conveying all of said leasehold estate in said four lots, 14, 15, 16 and 17, and the furniture in said hotel, to secure a certain indebtedness of said Heffron and said Gore, subject, however, to the liens of said trust deeds to Hurlbut and to Smith. On November 29, 1889, Gage filed his bill against Heffron and Gore to foreclose said trust deed, wherein, on April 6, 1891, a final decree was entered, and, thereunder, on March 15, 1894, said furniture and leasehold estate in lots 14, 15, 16 and 17 were sold by the master to John J. Knickerbocker and two others, executors and trustees of said Gore, who had deceased.

On January 9, 1889, Gore filed his bill of complaint against Heffron to dissolve their partnership, and claimed therein, that said hotel business and furniture and hotel building and the leasehold estate in lots 15 and 16 belonged to him and Heffron as partners. On April 25, 1891, Gore filed another bill against Heffron in the circuit court of Cook county, to ascertain their respective rights in said leasehold estate in said four lots. The litigation between Gore and Heffron resulted in a decree rendered by the circuit court on July 11, 1894, in favor of the Gore trustees for $257,386.46, which decree was made a lien on all of said property, subject to the liens of the Smith and Hurlbut trust deeds.

Henry S. Osborne and Frank S. Osborne were brothers and lawyers, who practiced law as partners under the firm name of F. S. & H. S. Osborne for many years. On January 1, 1889, the name of the law firm was changed to Osborne Bros. & Burgett. Pebbles was admitted to the firm in 1889, and Parkhurst in 1891. On May 1, 1895, Burgett withdrew from the firm. Although Frank S.

Osborne appears to have retained a nominal connection with the firm after 1891, yet in that year he abandoned the practice of law and engaged in other business, maintaining only a nominal, if any, connection with the law firm. Heffron was for many years a client of the firm, and had been a client of the firm while Frank S. Osborne was a member of it. He and the Osbornes appear to have been good friends, in addition to the relation of client and attorney which existed between them.

When the leasehold interest of Heffron in said lots 15 and 16, together with the hotel building thereon, was sold under the foreclosure decree on March 19, 1894, Heffron was substantially bankrupt or insolvent. He had no money to redeem from said foreclosure sale, and, although he made efforts to obtain money, he failed to do so. In the latter part of March or the early part of April, 1895; Mrs. Louise N. Osborne, the wife of Frank S. Osborne, came into possession of a large amount of money, somewhere in the neighborhood of $100,000.00, or more. Heffron had been doing business with the Hibernian Bank of Chicago, of which John V. Clark was president, and had been trying to borrow of Clark money enough to buy the certificate of sale, which had been issued to Horace E. Hurlbut, but had failed to induce Clark to let him have the money. It required about $161,399.79 to purchase the certificate. It was arranged, that Frank S. Osborne should advance half of this amount, and the other half was to be obtained from the Hibernian Bank. As a result of the various negotiations between the parties, the certificate was assigned by Horace E. Hurlbut to Frank S. Osborne. Frank S. Osborne gave to Hurlbut his check for $81,399.79. He borrowed $80,000.00 from the Hibernian Bank, and gave his note for $80,000.00, dated April 9, 1895, payable to the order of the Hibernian Banking Association in ninety days, with seven per cent interest, and deposited, as collateral security for the payment of said note, the certificate of sale, issued to Hurlbut, and

by Hurlbut assigned to him, he making a further assignment of said certificate of sale to the Hibernian Banking Association. Upon the execution of the note for $80,-000.00, and the pledging of the certificate as collateral security, Clark, the president, gave Frank S. Osborne a check for $80,000.00, which was by him indorsed and turned over to Hurlbut. The transaction was closed up finally on April 17, 1895. Frank S. Osborne thus paid the whole of the $161,399.79 to purchase the certificate.

The fifteen months, allowed for redemption from the sale under the Hurlbut trust deed, expired on June 19, 1895. No redemption having been made, a master's deed, dated June 20, 1895, was executed to Frank S. Osborne. In order to secure the bank what was due to it, it was arranged, that Frank S. Osborne should execute to the bank his note, and give a trust deed upon the leasehold estate in lots 15 and 16, which had been conveyed to him by the master's deed. In addition to the $80,000.00 due the bank, it was considered that $20,000.00 was needed to put the hotel in shape, and to pay for the furniture and taxes. Accordingly, application was made to Clark, the president of the bank, to lend $100,000.00, that is to say, to add $20,000.00 to the $80,000.00 already due. To this Clark assented, upon condition that Mrs. Osborne would guarantee Frank S. Osborne's note for $100,000.00. Thereupon Frank S. Osborne executed his note for $100,-000.00, dated June 20, 1895, payable to the order of the Hibernian Banking Association in ninety days after date with six per cent interest, and indorsed by Louise N. Osborne. At the same time, Frank S. Osborne executed another note for $110,000.00, dated June 20, 1895, payable to his own order and by him indorsed, and payable on demand, with six per cent interest, to secure which demand note for $110,000.00 he executed a trust deed to Frederic S. Hebard, the attorney of the bank, conveying the leasehold estate in said lots 15 and 16. This demand note for $110,000.00 and the trust deed to Hebard, secur-

ing it, were pledged as collateral to secure the note for $100,000.00, executed by Frank S. Osborne and indorsed by his wife.   Upon receiving these securities, the bank surrendered Frank S. Osborne's old note for $80,000.00, and paid to him the additional sum of $20,000.00, which was subsequently spent upon the hotel.

When the master's deed was executed to Frank S. Osborne, certain parties were in occupation of the hotel, holding under a lease from a receiver, appointed by the circuit court in the Gore and Heffron litigation.   The executors and trustees of Gore, having a decree against Heffron for $257,386.46, seem to have controlled the receiver in possession of the hotel, or, at any rate, they had a leasehold interest in lots 14 and 17 and owned the furniture and other property in the hotel building upon said lots 15 and 16.   In order to get possession of the hotel, Frank S. Osborne was forced to make a settlement with the Gore trustees, by the terms of which he bought out their interest in the leasehold estate and in the furniture and in the decree, and paid them therefor the sum of $32,500.00, besides giving certain bonds of indemnity to the Gore trustees.

The judgment for $100,000.00, entered up in favor of Burgett and Henry S. Osborne, was claimed to represent attorneys' fees, due from Heffron to the firm of Osborne Bros. & Burgett for services in the various litigations, to which Heffron had been a party.   The principal object of entering up this judgment, just before the fifteen months allowed for redemption from the foreclosure sale expired, was, that it might be used for the purposes of redemption, in case any judgment creditor of Heffron should attempt to redeem the property during the three months after March 19, 1895, which the judgment creditors had, under the statute, to redeem.   By consent of all parties it was agreed, upon the hearing of this case, that no more than $40,000.00 was equitably due upon this judgment.   The final decree, entered by the court below, from

which the present appeal is prosecuted, found that the appellee Louise N. Osborne consented to invest her money in the purchase of said certificate, upon an understanding that it was not to remain in the property longer than September 1, 1895; that said Heffron was not to have any interest in said certificate, but only a privilege to purchase the property by September 1, 1895; that the title to all of said lots might be perfected, and sold again to said Heffron at a reasonable advance over all outlays, provided the money should not be tied up beyond September 1, 1895; that, at the time the right to purchase was given to Heffron, it was agreed he should pay the cost of acquiring, maintaining and managing the whole of said property, if the whole should be acquired, and also a reasonable advance in addition thereto; that there was no agreement by said Frank, or said Louise, to loan money to Heffron for the purchase of said property; that it was not intended by any of said parties that the relation of mortgagor and mortgagee should arise; that the furniture and fixtures in the hotel building and the rights of the Gore trustees in said property made it essential to acquire their interest in the whole property, before the purchase of said lots 15 and 16 should be rendered of value; that, since said purchase, said Frank has held the said property, as trustee for said Louise, to manage and sell the same, and turn over the proceeds thereof to said Louise; that said Louise is the sole equitable owner of the leasehold estate in said lots 14, 15, 16 and 17 and the improvements thereon, and the furniture and fixtures in the hotel, and the decree against said Heffron, and all claims against said Heffron in connection with said property; that none of said purchases were made in the interest of, or in trust for, said attorneys, or to secure their fees, nor for their benefit, nor for the benefit of said Heffron, except only, that said Heffron was to have the right to become the owner of the property upon paying therefor as above stated; that, in the purchase and manage-

ment of said property, Frank S. Osborne had invested $207,995.86, and incurred liabilities, amounting to $24,-555.92, on June 30, 1896; that $161,431.95 of said $207,-995.86 was invested in the purchase of said certificate on April 17, 1895, in the manner above stated; that said Heffron did not agree to repay said Frank or his wife any of said sums of money, or become liable therefor; that he did not agree to repay said bank said $80,000.00 or $20,000.00 advanced by it, or become liable therefor; that he did not agree to indemnify said Frank against his liability to said bank or become liable for the money expended in the repair, management and conduct of said property; that Heffron has not made any offer or tender of said money to said Frank or Louise; that neither said Frank nor said Louise, is under any obligation to, or contractual relation with said Heffron or Osborne Bros. & Burgett, touching the leasehold interest in said lots or other property above mentioned; that since July 6, 1895, when said Frank entered into possession of said property, the net income thereof, after deducting the operating expenses, has not been sufficient to pay the fixed charges; that neither said Heffron, Burgett, Pebbles, Parkhurst, nor Henry S. Osborne, has any interest or right in said premises or property. In addition to the contents of the decree as already stated, it was therein ordered that said Heffron should have the right to pay for and purchase said property upon certain terms and conditions therein set forth; that, if he should not pay for and purchase the same on or before December 5, 1896, then, at any time thereafter, down to February 5, 1897, said Burgett should have the right to pay for and purchase the same upon said terms and conditions. The decree ordered, that Heffron, within the time specified, should have the right to purchase the leasehold interest in the four lots with the buildings and improvements thereon, and the furniture and fixtures, and the decree for $257,386.46, and the right of said Frank and Louise

acquired under the master's deed of June 20, 1895, and under the conveyances and assignments made by the Gore trustees to said Frank on July 6, 1895, upon the following conditions, to-wit: Upon paying to said Frank, as trustee for said Louise, $137,901.87, with legal interest from July 21, 1896; upon paying or assuming to pay the indebtedness secured by the trust deed to Frederic S. Hebard; upon giving bond with good and sufficient security to save said Frank harmless upon certain bonds therein named, executed by Frank S. Osborne to save the estate of Gore harmless from certain liabilities, one of said bonds being for $50,000.00, another for $30,000.00, and others for other amounts. The decree also adjudges, that, upon compliance with the said conditions, the said Frank and Louise shall execute assignments and conveyances, transferring their interest in said property and effects. The decree also orders, that, in default of such purchase and the payment of said money by said Heffron on or before December 5, 1896, or by said Burgett on or before February 5, 1897, then said Heffron, Burgett and the other defendants should be barred from having any right or interest in said leasehold estate, or in any of the improvements or property above mentioned.

S. P. SHOPE, and GRAHAM H. HARRIS, for appellants.

ROBERT F. PETTIBONE, for appellees.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

The main question in this case is, whether the original transaction was a purchase by the appellant, Frank S. Osborne, with a privilege to Heffron to buy, or whether it amounted to a loan to Heffron, so as to make the deed absolute to Frank S. Osborne a mortgage. This question is mainly one of fact. The evidence is somewhat conflicting. The chancellor, before whom the case was tried below, heard the witnesses testify orally, except that,

perhaps, the testimony of one witness, not particularly
material, was presented in the form of a deposition. The
record is large, and the evidence is voluminous. We do
not deem it necessary to enter into a minute discussion of
all the facts and circumstances, bearing upon the ques-
tion here presented. When the trial court has had an
opportunity of seeing the witnesses, and of hearing their
testimony as it is delivered orally, the findings of such
court upon mere questions of fact, when the testimony is
conflicting, will not, ordinarily, be disturbed on appeal,
unless such findings are clearly and manifestly against
the preponderance of the evidence. (*Lane* v. *Lesser,* 135
Ill. 567). After a careful examination òf the record, we
are not able to say that the findings of the lower court
are clearly and manifestly against the preponderance of
the evidence. Such findings are entitled to much weight,
where the witnesses are seen and examined orally, inas-
much as a better opportunity is thus afforded of arriving
at a correct conclusion as to the facts. (*Rackley* v. *Rackley,*
151 Ill. 332). In such cases a reversal is not authorized,
unless the error in the findings of the court below as to
the facts is clear and palpable. (*Coari* v. *Olsen,* 91 Ill. 273).
There are, however, some features of the transaction,
tending to confirm the correctness of the findings of the
lower court, which may be here briefly referred to.

A foreclosure decree had been rendered against the
appellant, Heffron, for a very large amount; and, under
this decree, the hotel property, located upon lots 15 and
16, had been sold to Horace E. Hurlbut on March 19, 1894,
for $146,747.15. A certificate of purchase was issued by
the master in chancery, who made the sale, to Hurlbut.
The time of redemption, allowed to Heffron to redeem
from this sale, expired on March 19, 1895. On April 17,
1895, the certificate of sale was transferred to the appel-
lee, Frank S. Osborne. When such transfer was made,
Heffron had no interest whatever in the property. His
right to redeem, which lasted during the year from March

19, 1894, to March 19, 1895, had expired. During the three months thereafter up to June 19, 1895, only his judgment creditors had a right to redeem. It is said by counsel for appellants, that the purchase of the certificate of sale after the expiration of twelve months from the date of the foreclosure sale is not material to the rights of Heffron in the hotel property. This may be true where the facts are such as are set forth in most, or many, of the adjudged cases referred to by counsel. It is impossible for us to examine or comment upon all of these cases. We will refer to only two. One of them is the case of *Moore* v. *Pickett*, 62 Ill. 158, and the other is the case of *Trogdon* v. *Trogdon*, 164 Ill. 144. In *Moore* v. *Pickett, supra,* the owner of land, which had been sold under execution, made an arrangement with the tenant, living upon the land, to redeem the same, and the tenant took an assignment of the certificate of purchase in his own name, while acting as the agent of the owner, his landlord, and afterwards procured the sheriff to make a deed to himself, instead of having it made to his principal; under these circumstances, it was there held, that, in equity, the agent was the trustee of his principal.

In the case at bar, however, Frank S. Osborne was not, at the time when he purchased the certificate of sale, the attorney or agent of the appellant, Heffron. He had retired from the active practice of the law some years before these occurrences. The money, with which the certificate was purchased, did not belong to Frank S. Osborne, but belonged to his wife, Louise N. Osborne. This fact was well known to Heffron. The evidence tends to show that Heffron, having learned of the fact that Mrs. Osborne had recently received a large remittance from New York, urged upon her husband, Frank S. Osborne, with whom he was upon terms of friendship, that such money should be used to buy the certificate. Reluctantly, but after much solicitation, Frank S. Osborne and his wife consented to make the purchase.

In *Trogdon* v. *Trogdon, supra,* it appears, that there was a written agreement, made between the purchaser of the certificate and the judgment debtor, providing for the cancellation of the same at a certain time upon the payment of a certain amount by the judgment debtor; that, in addition to this, a part of the money for the purchase of the certificate was furnished by the judgment debtor himself. No such facts, as are thus indicated, exist in the present case. Here, there was not only an absolute transfer of the certificate of sale to Frank S. Osborne, and subsequently an execution of the master's deed to him, but parol evidence only is relied upon for the purpose of showing, that such transfer and deed were intended as a mortgage, or security for a debt. In such cases, when the deed is absolute, and parol evidence is relied upon to show that there is a mortgage, the party, affirming that the instruments were intended as securities for a debt, must show that such was the intention by clear and convincing evidence. (*Keithley* v. *Wood,* 151 Ill. 566). Here, there was no such clear and convincing evidence. In *Helm* v. *Boyd,* 124 Ill. 370, we said (p. 374): "A deed absolute on its face may be shown by parol to be a mortgage. The law will, however, presume, in the absence of proof to the contrary, that such a deed is what it purports to be,—an absolute conveyance. The party, who claims an absolute deed to be a mortgage, must sustain his claim by proof sufficient to overcome this presumption of the law. Before a deed, absolute in form, will be held to be a mortgage, the evidence must be clear, satisfactory and convincing. It must be made to appear clearly that such a conveyance was intended to be a mortgage at the time of its execution. The question is one of intention to be ascertained from all the circumstances." (*Fisher* v. *Green,* 142 Ill. 80; *Jeffery* v. *Robbins,* 167 id. 375). In the latter case we said: "The question, whether a contract of re-sale and purchase is to be construed as a mortgage, depends on the intention of the parties at the time of the transfer." We are

unable to say, that the court below erred in holding that here there was not such intention. ·The rule, that the doubt as to the intention will be resolved in favor of the construction, that the conveyance is a security for a debt, is not so rigidly applied when oral evidence is introduced to show that the conveyance was a mortgage, as when it appears from a separate written instrument, that the transaction is not an unconditional sale, but is either a mortgage, or sale with right to re-purchase. (*Keithley* v. *Wood, supra*).

Again, neither when the certificate of sale was assigned to Frank S. Osborne, nor when the master's deed was executed to him, did any indebtedness exist from Heffron to Frank S. Osborne. In *Rue* v. *Dole*, 107 Ill. 275, the question arose, whether a transaction was an absolute sale or a mortgage, and we held it to be the former on the ground that there was no debt, and "that it is an essential element of a mortgage that some obligation should exist to be secured." In that case we said (p. 280): "The deed purports upon its face to convey the premises absolutely, and the contract is a mere re-sale of the premises upon the payment of a certain sum at a specified time. So far, then, as appears from the terms of the deed and contract, there is nothing to indicate that the transaction was a mortgage. * * * There is nothing in the circumstances that surround the arrangement that tends to show that the parties intended that the relation of mortgagor and mortgagee should still continue. * * * The land could not be conveyed as security for a debt· because there was no debt to secure." The language thus used in *Rue* v. *Dole, supra*, is precisely applicable to the present case. Again, in *Freer* v. *Lake*, 115 Ill. 662, it was held that "a debt or obligation of some kind is an essential element in the transaction to create the relation of mortgagor and mortgagee." (*Kerting* v. *Hilton*, 152 Ill. 658.)

It is undoubtedly true, that Frank S. Osborne's motive was a desire to help Heffron, and that the transaction was

172—16

for Heffron's benefit. But the proof clearly shows, that it was not the intention of Frank S. Osborne, or of his wife, to remain out of possession of their money longer than September 1, 1895. Hurlbut, from whom the certificate of sale was purchased, had given the parties to understand, that, when the title should be perfected by the execution of a master's deed, he would be able to effect a loan upon the premises for the whole amount of the money advanced, so that thereby Heffron could purchase back the property. It turned out, however, that Hurlbut was unable to make the promised loan. The agreement substantially was, that Frank S. Osborne, acting for his wife, would borrow $80,000.00 of the Hibernian Bank, and with this $80,000.00 and other money of Mrs. Osborne, would buy the certificate of sale, and, if it ripened without redemption into a title absolute, whatever might be necessary to acquire the interest of the Gore trustees should be done, so far as Mr. and Mrs. Osborne might deem it proper to make an additional investment of money; that Heffron should have the privilege of purchasing the property of them at any time on or before the first of the following September for what they might, at the time of such purchase, have put into it and a reasonable advance, the amount of which was not agreed upon at the time, but was afterwards fixed at $25,000.00, and that, if Heffron did not succeed in purchasing the property by the first of September, they might sell it to any one else.

The facts of the case at bar thus bring it within the ruling of this court in the case of *Eames* v. *Hardin*, 111 Ill. 634, the facts of which are very much like the facts here. There, certain lots of a part owner, having been sold at a judicial sale more than twelve months, he employed another to obtain the certificates of purchase and acquire the title, under an agreement on his part to purchase the same at an advance of $2000.00 on the sum required to be paid, besides the legal rate of interest, to enable him to perform a contract of sale to another; he also conveyed

other land to the purchaser as security for his perform-
ance of the contract to re-purchase the lots; and it was
held, that the advances made to acquire the title to the
lots were not a loan, and that the title so acquired was not
in the nature of a mortgage. In that case we said (p. 641):
"The doctrine is well settled that a party may purchase
land for another, take the deed in his own name, and bind
himself to convey it to the person at whose instance it
was purchased, on being paid the purchase price agreed
upon between the parties. The doctrine is well estab-
lished that one person may purchase land of another, and
sell it back to him on the payment of a stipulated price.
Such purchases and re-sales are always sustained where
the transaction is in good faith, and is not resorted to for
the purpose of evading the usury laws, or the transaction
is not tainted with fraud. This doctrine is so familiar that
it requires the citation of no authorities in its support.
*  *  *  The facts in this case are as strong as in *Mag-
nusson* v. *Johnson*, 73 Ill. 156, *Hanford* v. *Blessing*, 80 id. 188,
and *Caprez* v. *Trover*, 96 id. 456, in all of which the trans-
actions were held to be sales and re-purchases. This case
falls clearly within the principles announced in those
cases, and should be governed by them." (*Stephenson* v.
*Thompson*, 13 Ill. 186; *Taintor* v. *Keys*, 43 id. 332; *Sutphen*
v. *Cushman*, 35 id. 186; *Fisher* v. *Green*, *supra*).

Counsel for appellants speak of the transaction as
one, where Osborne advanced half of the money to pur-
chase the certificate of sale and Heffron borrowed the
other half from the Hibernian Banking Association. As
matter of fact, such was not the case. It required $161,-
399.79 to purchase the certificate of sale. If the bank had
advanced half of this amount to Heffron, and Osborne had
advanced the other half to Heffron, then the certificate,
if a security for the amounts advanced, would have been
made out to the bank, or its president, and to Osborne,
so that each would have held the title to an undivided
half of the property as security for each advance. But the

matter was not thus arranged. Osborne paid Hurlbut $81,399.79 in cash for his wife, and took an assignment of the certificate from Hurlbut to himself. Thereupon, Osborne borrowed $80,000.00 from the Hibernian Bank, and assigned the certificate of sale to the Hibernian Bank as security for the amount so borrowed, and also paid over the amount so borrowed to Hurlbut. Osborne thus dealt with the certificate as his own property by himself borrowing upon it, as security, from the bank $80,000.00. Heffron borrowed nothing. In an ordinary transaction, when a party advances money to another to purchase a certificate of sale, and has it assigned to himself, he may hold the title to the certificate as security for the money which he has advanced. But, in this case, Osborne went farther, and himself pledged the certificate for a loan from the bank to himself. So also, when the master's deed was executed, the deed was not made to the bank and to Osborne. The deed of the property was made by the master to Osborne. Osborne thereupon executed a trust deed upon the property to secure an indebtedness of his own of $100,000.00 to the bank, which indebtedness was guaranteed by his wife. If the master's deed was security in the hands of Osborne for a loan made to Heffron, the title obtained by it was also at once made security in the hands of the bank for a loan of $100,000.00 advanced by the bank to Osborne. How can it be said that the transaction was a mortgage securing an indebtedness from Heffron to Osborne, when, as matter of fact, the title was pledged to secure an indebtedness from Osborne to the bank? It must be observed, that Heffron is asking no relief in this case. Heffron has filed no bill to redeem. The bill in this case is filed by the appellant, Burgett. It is in the nature of a creditor's bill, setting up the recovery of a judgment against Heffron, the issuance of an execution thereon, and the return of the same unsatisfied. The complainant in the bill seeks to establish an interest in Heffron, in order that he may make the

judgment out of such interest. The bill filed by Burgett alleges, that the title held by Osborne was held, not only as security for the benefit of Heffron, but for the benefit of the owners of the judgment for $100.000.00. We discover no satisfactory evidence, that there was any agreement on the part of Osborne and his wife to hold the property as security for the amount due upon this judgment. The judgment was evidently entered up for a larger amount than was equitably due, because, by agreement, it is scaled down in this case from $100,000.00 to $40,000.00. The judgment appears to have been entered up for the purposes of redemption, in case it should be necessary to use it for such purpose, and in pursuance of a scheme to prevent the executors and trustees of the Gore estate from asserting any rights in the property. The Gore trustees owned the furniture in the hotel which was in full operation, as well as the west half of the leasehold estate on which the Open Board building was located. If the transaction was a mortgage, and not a *bona fide* purchase by Frank S. Osborne for his wife, then it is evident that the appellants intended to give the transaction the form of an absolute purchase, in order to deceive and defraud the Gore trustees and Heffron's judgment creditors. This being so, it cannot be said that the complainant, who filed this bill, comes into court with altogether clean hands. He who seeks equity must do equity.

The decree, which was entered on July 21, 1896, might well have found that appellants were not entitled to exercise the right to re-purchase the property at all, because the period, ending with September 1, 1895, during which, by the agreement, Heffron was to be allowed to re-purchase, had passed. But the cross-complainants, in their cross-bill, offered to allow the appellants to re-purchase the property upon reimbursing them for their advances; and they do not insist upon, and were not allowed by the decree, the agreed bonus of $25,000.00. In

pursuance of this offer in the cross-bill, the court below, in its final decree, gave the appellant, Heffron, until December 5, 1896, and the appellant, Burgett, until February 5, 1897, to buy back the property, in case they should be able to raise the money to do so.    They, however, have not paid, or offered to pay, any part of the advances made by Mr. and Mrs. Osborne.    Nor before the filing of the present bill did Heffron ever offer to pay back to the Osbornes any portion of their advances.

Some complaint is made of that portion of the decree, which requires the appellants to pay back the amount paid out by the appellees for the purchase of the outstanding interest of the Gore trustees in the furniture and in the leasehold interest upon the west half of the property.    We think, that this purchase from the Gore trustees was part of the same transaction with the purchase of the certificate of sale, and stands on the same footing.    The Gore trustees were in possession of the furniture and of the west half of the property.    It was impossible to operate the hotel without the possession of the furniture and of the interest owned by the Gore trustees.    It was necessary to purchase their interest, in order to make the property of any value.    There is testimony tending to show, that Heffron himself acceded to the wisdom and necessity of making the purchase from the Gore trustees.    There is also testimony tending to show, that the certificate of sale was purchased with the understanding, that the interest of the Gore trustees should be bought, if it should become necessary to do so.    The court below found in its decree: "that the furniture and fixtures in said hotel building and the rights of said trustees in the property made it essential to acquire their interest in the whole property, before the purchase of lots 15 and 16 could be rendered of value." We are of the opinion that this finding is sustained by the evidence.

Our conclusion, upon a careful examination of the whole record, is that the decree of the chancellor, who

tried the case below, and the judgment of the Appellate Court, affirming that decree, have done substantial justice between the parties, and that there is no good reason for a reversal of the action of the lower courts in this case.

Accordingly, the judgment of the Appellate Court and the decree of the Superior Court are affirmed.

*Judgment affirmed.*