CARRIE C. ELY *v.* WALTER LEE BROWN *et al.*

and

WALTER S. MAHER *v.* SAME.

*Opinion filed December 18, 1899—Rehearing denied February 20, 1900.*

1. BOUNDARIES—*if monuments are lost, recorded plat may be referred to to ascertain dimensions.* Courses and distances must yield to monuments, but where the original monuments are lost the recorded plat may be referred to to ascertain the dimensions of the land.

2. SAME—*plat should be construed in favor of grantee in case of conflict between caption and marked distances.* In case of conflict between the caption of a plat and the actual distances marked upon it, the plat should be construed most strongly against the grantor and most favorably for the grantee.

3. SAME—*proper disposition of surplus or deficiency upon survey of a platted tract.* Upon survey of a platted tract a deficiency or surplus should be divided *pro rata* among the lot owners.

4. LIMITATIONS—*interruption of adverse possession breaks the running of the statute.* An interruption to an open, notorious, actual, exclusive and adverse possession prevents the running of the statute and interferes with the claim of title by one in such possession.

5. SAME—*if possession alone is relied upon it must be an actual occupancy.* In the absence of a paper title, possession relied upon for any legal purpose must be an actual occupancy of the premises and not a mere constructive possession.

6. SAME—*what necessary in order that the separate possessions may be tacked.* Before the several possessions of successive disseizors can be joined together so as to be regarded as a continuous possession there must be privity of estate or title, since acts of possession at different times by different persons, between whom there is no privity, furnish no support to each other.

7. SAME—*when possession by husband cannot be tacked to possession by wife.* Adverse possession by a husband of a strip of land adjoining and partly enclosed with a city lot to which he held the paramount title, cannot be tacked to a subsequent possession by the wife under a deed from the husband describing the lot alone, though they continue, after the conveyance, to reside together upon the lot. (BOGGS and CARTER, JJ., and CARTWRIGHT, C. J., dissenting.)

8. TAX DEEDS—*tax deed issued on purchase by collector in 1870 is void.* A tax deed issued on a certificate of purchase by the tax collector for land sold for taxes in 1870 is void under section 12 of the Revenue act then in force. (Gross' Stat. 1871, p. 575.)

9. SAME—*when tax deed is invalid under section 211 of the Revenue act.* A tax deed issued to a purchaser, who permitted the land to again be sold for taxes within two years after the date of his purchase, is invalid, under the express provisions of section 211 of the Revenue act, when issued before the time limited in such case had expired.

10. SAME—*tax deed not recorded within time required by statute is invalid.* Failure to record a tax deed within one year after the time for redemption expired, as required by section 225 of the Revenue act, renders the deed invalid.

11. SAME—*tax deed is void if taxes were paid before sale.* A tax sale is improper and a deed based thereon is invalid where the taxes were paid in advance of the sale.

12. CLOUD ON TITLE—*one seeking to remove cloud must prove ownership.* One who seeks to remove clouds from his title must prove his ownership of the property as alleged in his bill.

13. SAME—*trust deed by one claiming under void tax deed is a cloud.* A trust deed is void and properly removed as a cloud on title when given by one whose title rested upon an invalid tax deed.

14. PLATS—*when plat made by county clerk is a cloud on title.* A plat made by the county clerk is invalid and a cloud on title when not certified as contemplated by section 63 of the Revenue act, or when the names, widths, courses and extent of the streets thereon are not set forth as provided by section 1 of act on Plats.—Rev. Stat. 1874, p. 771. (BOGGS and CARTER, JJ., and CARTWRIGHT, C. J., dissenting.)

15. COSTS—*when taxes cannot be refunded upon setting aside the deeds based thereon.*  Taxes paid upon property under an indefinite and uncertain description, by one claiming under invalid tax deeds set aside as a cloud on title, will not be refunded where the true owner paid the taxes each year.

APPEAL from the Circuit Court of Cook county; the Hon. ELBRIDGE HANECY, Judge, presiding.

This is a bill, filed originally by Edwin Lee Brown as owner of lots 1, 2 and 3 in block 1 in Jennings' subdivision of part of Jennings & Moffett's subdivision of the south 60 acres of the east half of the south-west quarter of section 10, township 38, north, range 14, east of the third principal meridian, in Cook county, Illinois, to remove as clouds from his title certain tax deeds, and deeds based upon such tax deeds, held by the defendants below, the appellants in this court, and also to remove and declare void a certain subdivision known as county clerk's subdivision of unsubdivided lands in said quarter section.  Answers and replications were filed, and the hearing in the court below resulted in a decree in favor of the present appellees, who are devisees of Edwin Lee Brown, deceased, substantially in accordance with the prayer of the bill.  This appeal is prosecuted from said decree by appellants, Carrie C. Ely and Walter S. Maher.

The original bill was filed on August 14, 1890, making Walter S. Maher, John O'Brien and Ellen O'Brien parties defendant.  On July 21, 1891, Edwin Lee Brown, who had filed the original bill, died testate, devising all his property to the appellee Walter Lee Brown and the other appellees herein, who are his children.  On February 19, 1896, an amended and supplemental bill was filed herein by said devisees and children, making the appellants Walter S. Maher and Carrie C. Ely, defendants thereto, and praying the same relief prayed in the original bill.

The original bill sets up, and the documentary proof introduced in evidence shows, the chain of title under which the appellees claim to be the owners of said lots

183—37

above described. That chain of title is substantially as follows:

On August 3, 1835, one Carding Jackson was the owner of the south-west quarter of said section 10. By a warranty deed dated July 1, 1840, and recorded March 2, 1843, and by a quit-claim deed dated July 16, 1851, and recorded July 17, 1851, Carding Jackson and wife conveyed to Orrin Jackson "a part of the E. $\frac{1}{2}$ of the S. W. $\frac{1}{4}$ of Sec. 10, T. 38, N. R. 14, E. 3d P. M., commencing at the center stake of said section; thence running west eighty rods, thence south far enough that a parallel line with the first mentioned line shall make 20 acres of land; from thence east to the east line of said quarter section, and thence north to the place of beginning, containing 20 acres." It is conceded, that one Elisha Bayley acquired the title of Carding Jackson to said 20 acres. In March, 1859, Elisha Bayley subdivided said 20 acres, describing his subdivision as the north 20 acres of the east half of said south-west quarter.

On February 28, 1859, by a series of conveyances, beginning with the heirs of Carding Jackson, William B. Egan had become and was the owner of the east half of the south-west quarter of said section 10, except the north 20 acres thereof. On February 28, 1859, by warranty deed of that date, William B. Egan and wife conveyed to Francis M. Drexel "the E. $\frac{1}{2}$ of S. W. $\frac{1}{4}$ of Sec. 10, etc., except the north 20 acres, the tract hereby conveyed containing 60 acres, more or less, situated in Cook county, Illinois," which deed was recorded March 1, 1859. By warranty deed dated March 27, 1868, and recorded April 6, 1868, the widow and executors of said Drexel, under the power contained in Drexel's will, conveyed to John D. Jennings and Charles G. Wicker the south 60 acres of the east half of the south-west quarter of said section 10. By deed dated April 23, 1868, and recorded on the next day, Wicker and wife conveyed an undivided one-fourth of said south 60 acres to Erasmus Moffett, and by deed dated Febru-

ary 13, 1869, recorded February 18, 1869, Wicker and wife conveyed the other undivided one-fourth of said south 60 acres to John D. Jennings. On March 12, 1869, Jennings and Moffett recorded a plat of a subdivision known as "Jennings & Moffett's subdivision of the south 60 acres of the E. $\frac{1}{2}$ of the S. W. $\frac{1}{4}$ of Sec. 10, T. 38, R. 14, areas of blocks calculated to centers of streets." The east half of said quarter section is now bounded on the north by Fifty-first street, in the city of Chicago; on the east by South Park avenue (formerly Kankakee avenue); on the south by Fifty-fifth street, and on the west by Indiana avenue. The plat of Jennings & Moffett's subdivision shows a subdivision of the tract thereby subdivided into nine blocks, numbered from 1 to 9 inclusive, block 1 being in the north-east corner of the subdivision, the east line thereof fronting upon Kankakee avenue (now South Park avenue.) Fifty-third street runs east and west, south of blocks 1, 2 and 3. Fifty-fourth street runs east and west, south of blocks 4, 5 and 6. The surveyor's certificate upon the plat of Jennings & Moffett's subdivision is as follows: "This certifies that I have surveyed and subdivided the south 60 acres of the E. $\frac{1}{2}$ of the S. W. $\frac{1}{4}$ of Sec. 10, etc., and that the accompanying plat is a correct representation of said survey and subdivision," which certificate is dated February 25, 1869. By special warranty deed dated June 3, 1869, and recorded June 15, 1869, said Moffett and wife conveyed to said Jennings an undivided one-fourth of block 1 and other blocks in said Jennings & Moffett's subdivision. On May 5, 1870, Jennings recorded a map of a subdivision entitled "Jennings' subdivision of part of Jennings & Moffett's subdivision of the S. 60 ac. of E. $\frac{1}{2}$ of the S. W. $\frac{1}{4}$ of Sec. 10, T. 38, R. 14." By his certificate upon the plat to the latter subdivision the surveyor certifies "that I have subdivided blocks 2, 3 and 5, the north $\frac{1}{2}$ of 7, 8 and 9, the north 155.3 feet of 4, the north 151.3 feet of 6, and all of block 1, except the south 300 feet of the east 180 feet of block 1 of Jennings & Moffett's sub-

division of the south 60 acres of the E. ½ of the S. W. ¼ of
Sec. 10, etc., and that the annexed plat is a correct repre-
sentation of said subdivision," which certificate is dated
April 11, 1870.  On said plat in the center of Fifty-third
street appear these words: "E. & W. center line of E. ½ of
S. W. ¼ aforesaid." Lots 1, 2 and 3 of block 1 in Jennings'
subdivision are the lots owned by the appellees in this
case.  The north line of lot 1 is the north line of said
subdivision, and is 180 feet deep, running back from South
Park avenue.  Lot 1 fronts 80.3 feet on South Park ave-
nue, and lots 2 and 3 each front 50 feet on South Park
avenue.  By warranty deed dated April 1, 1870, and
recorded April 7, 1873, Jennings and wife conveyed to
Henry H. Honoré the said lots 1, 2 and 3 in block 1 of said
Jennings' subdivision.  By warranty deed dated June 29,
1872, and recorded April 7, 1873, Henry H. Honoré and
wife conveyed to Edwin Lee Brown said lots 1, 2 and 3.

By quit-claim deed dated November 14, 1870, and re-
corded March 20, 1875, John D. Lankenan and Francis A.
Drexel, only surviving executors of Francis M. Drexel,
deceased, conveyed to said John D. Jennings and Charles
G. Wicker "all right, title and interest in and to  *  *  *
the E. ½ of the S. W. ¼  *  *  *  except the north 20
acres thereof, containing 60 acres more or less, and being
the same premises conveyed to said Francis M. Drexel
by William B. Egan by deed dated February 28, 1859, and
recorded, etc., intending hereby to ratify and confirm a
deed from the first party, as executors, (they being joined
therein by Catharine Drexel, now deceased, as executrix,)
to the said second party, dated March 27, 1868, and re-
corded in book 415 of deeds, page 445, by which deed it
was intended to convey the same 60 acres, more or less,
purchased from said Egan."  By quit-claim deed dated
December 17, 1870, recorded March 20, 1875, Charles G.
Wicker and wife conveyed to said John D. Jennings "all
his right, title and interest in and to blocks 1 and other
blocks in Jennings & Moffett's subdivision of the south 60

acres of the E. ½ of the S. W. ¼ of Sec. 10, etc., according to the government survey thereof, being 60 acres more or less." By deed dated April 1, 1875, said John D. Lankenan and Francis A. Drexel, as only surviving executors, etc., conveyed to John D. Jennings and Charles G. Wicker "the E. ½ of the S. W. ¼ of Sec. 10, etc., except the north 20 acres thereof, containing 60 acres more or less, and being the same premises conveyed to said Francis M. Drexel by William B. Egan, whose deed was dated February 28, 1859;" which deed dated April 1, 1875, after reciting the will of Francis M. Drexel and the power thereunder, also makes the following recital: "On March 27, 1868, Catharine Drexel and first parties sold the premises hereinafter described to said second party for $90,000.00, and executed a warranty deed, intended to be a full conveyance of the title to the premises hereinafter described, the said Catharine Drexel joining therein, both in her own right as widow of Francis M. Drexel, deceased, and as executrix, which deed was filed for record, etc.; that the said Catharine Drexel has since deceased, and said first party herein are the only surviving executors of said last will and testament of Francis M. Drexel, deceased; application has been made to them by said second parties, purchasers as aforesaid, for a confirmatory deed to supply and correct any imperfections and informalities in said former deed; now, therefore," etc.

The tax deeds, described in the bill and testimony, are as follows:

Tax deed, dated September 29, 1873, and recorded January 29, 1878, executed by Joseph Pollock, county clerk, to James H. Ely, based on a sale made December 3, 1870, for the taxes of 1869, and conveying "a strip of land 14 feet wide extending across the E. ½ of the S. W. ¼, north and adjoining the south 60 acres thereof, containing .425 of an acre, S. E. ¼ Sec. 10, 38, 14;" also tax deed executed by E. F. C. Klokke, county clerk, to Mrs. Johana Mackey, dated October 14, 1882, on sale of October 1, 1880, for taxes

of 1879, conveying "14 feet north and adjoining the south
60 acres of the E. ½ of the S. W. ¼ of Sec. 10, T. 38, N. R.
14, E. of the 3d P. M.;" also tax deed executed by W. M.
Ryan, county clerk, to John O'Brien, dated January 2,
1885, and recorded September 24, 1885, on sale of Septem-
ber 1, 1882, for taxes of 1881, conveying "the E. 2-5 of a
strip of land 28.88 feet north and south, and running east
and west adjoining the north line of Jennings & Moffett's
subdivision of the south 60 acres of the E. ½ of the S. W.
¼ of Sec. 10, 38, 14; also adjoining the south line of Elisha
Bayley's subdivision of the N. ½ of N. E. ¼, S. W. ¼, 10, 38,
14;" also tax deed by county clerk to John O'Brien dated
January 2, 1885, and recorded September 24, 1885, on sale
of September 1, 1882, for the back taxes of 1880, convey-
ing the whole of the strip of land 28.88 feet wide, as de-
scribed in last above deed. By deed dated October 18,
1882, Johana Mackey quit-claimed all her interest in the
14-foot strip described in her deed, to the appellant Wal-
ter S. Maher. By quit-claim deed dated November 11,
1885, John O'Brien conveyed to the appellant Walter S.
Maher the strip 28.88 feet wide as above described. By
quit-claim deed dated January 24, 1888, and recorded Feb-
ruary 7, 1888, James H. Ely and wife conveyed to Walter
S. Maher, one of the appellants, "all that part of the E. ½
of S. W. ¼ of Sec. 10, etc., lying south of the north 20 acres
and north of the south 60 acres of the said E. ½ of the
S. W. ¼ of said Sec. 10." By quit-claim deed dated Jan-
uary 25, 1888, and recorded February 7, 1888, Walter S.
Maher and wife conveyed to the appellant Carrie C. Ely,
the then wife of James H. Ely, "a strip of land 14 feet in
width north and south, lying south and adjoining lots 14
and 15 of Elisha Bayley's subdivision of the north 20 acres
of N. E. ¼ of the S. W. ¼ of Sec. 10, etc., said strip of land
extending from the west line of South Park avenue to the
center line of Calumet avenue extended." Some time in
1888, James H. Ely died, and the appellant Carrie C. Ely
is his widow.

The following is a copy of Jennings & Moffett's sub-division of the south 60 acres of the east half of the south-west quarter of section 10, township 38, range 14:

The following is a copy of Jennings' subdivision of part of Jennings & Moffett's subdivision of the south 60

acres of the east half of the south-west quarter of section 10, township 38, range 14:

The following is the surveyor's certificate upon the plat of Jennings & Moffett's subdivision of the south 60 acres of the east half of the south-west quarter of section 10, township 38, range 14:

"This certifies that I have surveyed and subdivided the south 60 acres of the E. ½ of the S. W. ¼ of Sec. 10, Town 38, N. of R. 14, E. of 3d P. M., and that the accompanying plat is a representation of said survey and subdn.

CHICAGO, *Feb'y 25, 1869.*　　ALEX. WOLCOTT, *County Surveyor.*"

· The following is the surveyor's certificate upon the plat of Jennings' subdivision of part of Jennings & Moffett's subdivision of the south 60 acres of the east half of the south-west quarter of section 10, township 38, range 14:

"STATE OF ILLINOIS, } ss.
   Cook County.    }

"I, Alex. Wolcott, do hereby certify that I have subdivided blks. 2, 3 & 5, the N. ½ of 7, 8 & 9, the north 155.3 ft. of 4, north 154.3 ft. of 6, and all of blk. 1 except the south 300 ft. of the east 180 ft. of block 1 of Jennings & Moffett's subdivision of the south 60 acres of the east ½ of the south-west ¼ of section 10, town 38, north, range 14, east, and that the annexed plat is a correct representation of said subdivision. The distances are in feet.     ALEX. WOLCOTT, *County Surveyor.*

CHICAGO, *April 11, 1870.*"

R. S. THOMPSON, for appellant Carrie C. Ely.

WILSON, MOORE & McILVAINE, for appellant Walter S. Maher.

MERRICK, EVANS & WHITNEY, A. M. PENCE, and LYNDEN EVANS, for appellees.

Mr. JUSTICE MAGRUDER delivered the opinion of the court:

*First*—The first question relates to the ownership by appellees of the strip or strips of ground claimed by the appellants and described in the tax deeds set forth in the statement preceding this opinion. This being a bill by the appellees to remove clouds from their title, they aver, and must prove, that they are the owners of the property from which it is sought to remove the clouds alleged to exist. The appellants insist that the appellees do not own the strip or strips claimed by them, and that the appellees never had any title to such strip or strips. The piece of ground in dispute between the parties is alleged by appellants to be located between the south line of Bayley's subdivision of the north 20 acres of the east half of the south-west quarter of section 10,

and the north line of Jennings & Moffett's subdivision of the south 60 acres of the east half of said south-west quarter. The strip in dispute is fixed by the various witnesses at different widths, one surveyor giving the width as being 22.35 feet, another giving it as being 24.45 feet, and still another as being 26.10 feet. The appellant Carrie C. Ely claims to be the owner, by possession for the statutory period of twenty years, and by tax deeds, of that portion of the strip in question 14 feet wide which lies south of and adjoining the north 20 acres of the east half of said south-west quarter. The balance of the strip, after taking out the 14 feet, is claimed by the appellant Maher.

The contention of the parties grows out of the existence of a surplus of ground in the east half of the south-west quarter of section 10. According to the original government survey the east half of the south-west quarter of said section 10 should contain 80 acres, but, as matter of fact, there is more than 80 acres in the tract. The east line, fronting on South Park avenue, where the lots of the appellees front, should have, according to government survey, a length of 2640 feet from north to south and a width of 1320 feet from east to west. But, by actual measurement, the east line of the east half of said south-west quarter is, according to the testimony of one surveyor, 2652.2 feet in length, and according to the testimony of another surveyor it is 2654.3 feet in length, while the width of the north line of the tract running east and west, instead of being 1320 feet, is 1328 feet. There is, thus, a surplus in the tract of either 12.2 feet or 14.3 feet in the length of the tract from north to south, and a surplus of 8 feet in the width of the tract from east to west. Frederick Greely, one of the surveyors, testifies that the entire distance from the center line of Fifty-first street, which is conceded to be the north line of the east half of said south-west quarter, to the center line of Fifty-fifth street, which is conceded to be the

south line of the east half of said south-west quarter on South Park avenue, is 2652.2 feet. It seems to be admitted by both parties that the east line of Bayley's subdivision of the north 20 acres, fronting on South Park avenue, is 660 feet long on South Park avenue. The testimony of the surveyors shows, that by adding together the lengths of the east lines of blocks 1, 6 and 7 in Jennings & Moffett's subdivision, which front on South Park avenue, together with the widths of Fifty-third and Fifty-fourth streets, which run through the subdivision, the whole length of the east line of Jennings & Moffett's subdivision is 1990 feet. Surveys made by the surveyors also show that the actual length of the east line of Jennings & Moffett's subdivision is 1990 feet. If the sum of the length of the east line of Bayley's subdivision, to-wit, 660 feet, and the length of the east line of Jennings & Moffett's subdivision, to-wit, 1990 feet,—such sum being 2650 feet,—be taken out of the length of the east line of the east half of said south-west quarter as fixed by Greely, to-wit, 2652.2 feet, there appears to be a surplus of 2.2 feet. This surplus may be a little more than 2.2 feet, as it is fixed by another surveyor, named Rossiter, at 4.3 feet. The small surplus which is thus shown to exist is attributed by some of the surveyors who are witnesses in the case to differences in temperature and variation in the length of the chain used by the surveyors, some surveyors drawing the chain tighter than others. Rossiter says in his testimony: "The instruments, which surveyors used at that time (when Jennings & Moffett's subdivision was made) were not accurate as those in use to-day. There are several grounds for divergencies in the surveyor's reports. The temperature causes variation in the length of the tape. Some surveyors draw the tape tighter than others."

But it is contended by the appellants, and with much force, that when Jennings & Moffett's subdivision was made, on March 18, 1869, Jennings & Moffett owned only

the south 60 acres of the east half of said south-west quarter, that being the total amount of land conveyed by the widow and executors of Francis M. Drexel to Jennings and Wicker by the deed of March 27, 1868. Inasmuch as the width of the east half of the south-west quarter is 1328 feet instead of 1320 feet, the length of the east line of the south 60 acres of the tract, instead of being 1980 feet, as it would be in case there were no surplus, is, as matter of fact, only 1969.85 feet. The testimony of all the surveyors seems to fix upon 1969.85 feet as the actual length of the east line of the south 60 acres. The length of the east line of Jennings & Moffett's subdivision being, as shown by the measurements on the plat of the subdivision and by actual survey, 1990 feet, as already stated, a deduction of 1969.85 feet, being the actual length of the east line of the south 60 acres, from the 1990 feet, leaves 20.15 feet, to which, if there be added the 2.2 feet already mentioned, there is a strip of 22.35 feet north of the south 60 acres of the tract.

It is claimed by the appellants that the appellees have no title to this strip 20.15 feet or 22.35 feet wide, according to the force to be given to mistakes of the surveyors or variations in their chains, due to temperature or the tightening or slackening of their chains. It is undoubtedly true that the deed of March 27, 1868, by the widow and executors of Drexel to Jennings & Wicker, conveyed only the south 60 acres of the east half of the south-west quarter, and, that being so, Jennings & Wicker took by that deed a tract of land the east line of which was only 1969.85 feet in length. They, therefore, had no title at that date to the 20.15 feet north of the north line of said south 60 acres. But, as matter of fact, they platted a tract of ground which contained a strip 20.15 feet or 22.35 feet wide, north of said south 60 acres.

Counsel for appellants say that there are no monuments or stakes at the north-east corner of Jennings & Moffett's subdivision to indicate that the north line of

said subdivision was 1990 feet from the south line there-
of, and that the plat does not indicate in any way the
location of any such stake or monument. The proof does
not show that any such monument was placed at the
north-east corner of the subdivision, but the paving of
the streets, made necessary by the growth of the city,
may have led to the removal or destruction of any stone
or stake which may have been placed there by the sur-
veyor. In the absence of any monument, the distances,
as entered upon the plat in figures, together with the
actual surveys made upon the ground, indicate that a
tract of ground whose east side was 1990 feet long was
actually platted and subdivided by Jennings and Moffett.
Courses and distances must yield to monuments, (*Cotting-
ham* v. *Parr*, 93 Ill. 233,) but, where the original monuments
are lost, the recorded plat may be referred to for the
ascertainment of the dimensions of the land. *Francois* v.
*Maloney*, 56 Ill. 399.

Counsel for appellants say that the plat of Jennings
& Moffett's subdivision is entitled a subdivision "of the
south 60 acres of the east half," etc., and that the sur-
veyor certifies to a survey of the south 60 acres of the
east half, etc., and that the appellees must be bound by
the caption and the certificate, so as to be estopped from
contending that any other tract was subdivided than a
tract whose east line was 1969.85 feet in length. The
surveyor's certificate certifies that "the accompanying
plat is a correct representation of said survey and sub-
division." When we examine the accompanying plat we
find that the length of the east line is 1990 feet. There-
fore, the caption, and the first paragraph of the certifi-
cate of the surveyor, must be qualified by the statement
that the plat contains a correct representation of the
survey. If there be a doubt as to whether the caption
or the actual distances as marked upon the plat should
govern, the rule is applicable which applies to deeds:
that a deed must be construed most strongly against the

grantor and most favorably for the grantee. If a deed contains two descriptions of the land conveyed which do not coincide, the grantee is at liberty to elect that which is most favorable to him. (*Peoria and Pekin Union Railway Co.* v. *Tamplin,* 156 Ill. 285). There is no reason why the same principle thus applicable to deeds should not apply to plats, and to those holding under the subdividers of land according to plats. We are, therefore, of the opinion that the north 20.15 feet or 22.35 feet in question was actually embraced in Jennings & Moffett's subdivision.

The question then arises whether Jennings & Moffett had any right to plat the 20.15 feet, or 22.35 feet, when the records did not show any legal title in them to that strip. When the executors and widow of Drexel conveyed to Jennings & Wicker they owned the east half of the south-west quarter except the north 20 acres thereof, although they deeded only the south 60 acres of the east half of the south-west quarter. The confirmatory deeds made by the surviving executors on November 14, 1870, and April 1, 1875, show that the executors actually sold to Jennings & Wicker the whole of the east half of the south-west quarter except the north 20 acres thereof, whether the same was exactly 60 acres or more than 60 acres. There was evidently a mistake made in the deed as to the quantity of land conveyed. This mistake is not proven by oral testimony, but appears from the confirmatory deeds of the grantors themselves. Upon the basis of the statements in those confirmatory deeds a court of equity would have compelled the executors of Drexel to convey to Jennings & Wicker all of the east half of the south-west quarter except the north 20 acres thereof, which included the strip of 20.15 feet or 22.35 feet in question. It would appear, therefore, that when Jennings & Moffett's subdivision was made, the parties, making that subdivision had an equitable right to have the strip in question conveyed to them, even though they may not then have owned the legal title thereto.

But, whether it be true or not that Jennings & Wicker had an equitable title to the surplus of ground, which was not conveyed to them by the deed of March 27, 1868, we think that the title to the strip in question became vested in the appellees upon another ground, different from any that has been referred to.

On November 14, 1870, the surviving executors of Drexel deeded to Jennings & Wicker all their interest in the east half of the south-west quarter except the north 20 acres thereof. This deed put in Jennings & Wicker the title to all of the east half of the south-west quarter, including the strip in question, which was not conveyed to them by the original deed of March 27, 1868. A little more than a month thereafter, to-wit, on December 17, 1870, Wicker and his wife conveyed to Jennings all his interest in block 1 and the other blocks in Jennings & Moffett's subdivision. This latter deed from Wicker unquestionably vested in Jennings the title to the whole of block 1, in which the lots of the present appellees lie, and the strip 20.15 feet wide was certainly a part of block 1, and was just south of the north line of block 1, or the north line of lot 1 in block 1 now owned by the appellees. Prior to November 14, 1870, and December 17, 1870, at which dates Jennings, through the deeds from the executors to himself and Wicker and through the deed from Wicker to himself, obtained title to the 20.15 feet in question, Jennings had conveyed lots 1, 2 and 3 in block 1 of Jennings' subdivision, by a warranty deed, to Henry H. Honoré, and afterwards, on June 29, 1872, Honoré, by a warranty deed, had conveyed the said lots to Edwin Lee Brown, the father of the present appellees. By virtue of the warranty contained in the deed of Jennings to Honoré, the title to the strip which Jennings obtained in November and December, 1870, vested in Honoré and his grantee. The after-acquired title of Jennings enured, by virtue of these conveyances, to his grantee and his assigns. (19 Am. & Eng. Ency. of Law, p. 1021).

We are, therefore, of the opinion that at least 20.15 feet of the surplus in question was embraced in block 1 of Jennings & Moffett's subdivision, and that the title thereto became subsequently vested in the grantees of Jennings, including Edwin Lee Brown, by virtue of the covenants of warranty already mentioned. It follows, that the appellees (complainants below) had such a title as authorized them to file a bill to remove clouds therefrom. The court below adjusted the small surplus of 2.2 feet, or thereabouts, by pro-rating the same among the lot owners. This is a correct disposition of it, as it is reasonable and just that, where there is a deficiency or surplus, a *pro rata* division of the same should be made. (*Francois* v. *Maloney, supra*). But whether appellees can be regarded as having any title to the 2.2 feet or not, they certainly had title to the 20.15 feet; and, inasmuch as the appellants have shown no title themselves to the 2.2 feet, it is a matter of no concern to them whether the title thereto is in the appellees, or still remains in Jennings & Wicker, or either of them.

*Second*—The appellant, Carrie C. Ely, claims title through an alleged possession of more than twenty years. The circuit court has found in its decree that there was no possession of the strip in question, 14 feet wide, by Carrie C. Ely or James H. Ely, her husband, or either of them, "for a period of twenty years so continuous, open and adverse as to give notice, or as to come within the statute." We are not disposed to interfere with the finding of the chancellor upon this question of fact. "When the trial court has had an opportunity of seeing the witnesses, and of hearing their testimony as it is delivered orally, the findings of such court upon mere questions of fact, when the testimony is conflicting, will not, ordinarily, be disturbed on appeal, unless such findings are clearly and manifestly against the preponderance of the evidence." (*Burgett* v. *Osborne,* 172 Ill. 227, and cases there cited). Here, all the witnesses, who testified upon the

subject of possession, were examined orally in open court before the chancellor, and, after a careful examination of their testimony, we are unable to say that the findings of the lower court are clearly and manifestly against the preponderance of the evidence.

The testimony of the appellants is contradicted in important particulars by that of the appellees. In regard to some matters the witnesses of the appellants make inconsistent and contradictory statements, and their relations with James H. Ely were so intimate, that their testimony exhibits a very perceptible bias. The main witness is the widow of James H. Ely, who received a deed of the strip in question from Maher in 1888 and claims to own it, and has, therefore, a pecuniary interest in this controversy. Another witness was an inmate of Ely's family for fifteen years, and another occupied the same office with him for four years. It was material for the appellants to show, in order to establish their claim of twenty years' possession, that there was a fence on the south side of the strip for twenty years, and what sort of a fence it was. One of the above witnesses stated that the same fence stood there in 1888 which was there in 1866, and that it was during all that time a board fence, while the testimony of another one of the above witnesses showed that, during a greater portion of the period in question, the fence, as to 123 feet of it, was a picket fence. The continued existence of the fence, as asserted by the witnesses of appellants, is negatived by testimony showing that at one time a part of the fence was gone, and at other times it was removed entirely. The witnesses differ, also, as to its precise location. We forbear to comment further upon the evidence, but its unsatisfactory character, taken in connection with the observations hereafter made, justifies the finding of the court below upon this subject.

The strip, claimed by appellant, Carrie C. Ely, is a part of the north 14 feet of the strip alleged to be be-

183—38

tween Bayley's subdivision on the north and the south
60 acres of the east half of said south-west quarter. The
strip is described in the deed from Maher to Mrs. Ely,
as such description is given in the statement preceding
this opinion. Counsel for Mrs. Ely states that she claims
that portion of the strip mentioned in said deed, which
lies east of a line 180 feet west of South Park avenue.
The portion of the 14-foot strip so claimed lies south of
and adjoining lot 15 (or lots 14 and 15) of Bayley's subdi-
vision of the north 20 acres of the north-east quarter of
said south-west quarter.   In 1862 James H. Ely owned
said lot 15 and built a house upon it.   The contention of
appellants is, that Ely built a fence along the south side
of a strip 14 feet wide lying south of and adjoining lot 15,
so as to enclose the strip with lot 15.   In other words,
instead of building his south fence on the south line of
his own lot, to-wit: lot 15, he built it 14 feet south of that
line.   There is testimony tending to show that there was
a fence on the east side of lot 15, that is to say, on South
Park avenue, which ran south and connected with the
fence on the south side of the 14-foot strip.   Whether Ely
had fences on the north and west sides of lot 15, on which
his house stood, does not clearly appear.   Appellants con-
tend that, by the enclosure thus made, Ely was in posses-
sion of the 14-foot strip south of his lot from 1862 to 1888
when he died, a period of some twenty-six years.   It is
not claimed, that this strip was fenced in by itself and
separately from lot 15.   There was no fence at all upon
the north side of the 14-foot strip, nor is it clear that
there was any fence on its west end.   It was merely en-
closed with lot 15.

The evidence is not conclusive, that this south fence
was built as early as 1862, but it does show that it was
built as early as 1866.   It was not necessary for Ely to
acquire title to lot 15 by an adverse possession, because
he already owned the paramount title thereto.   The ad-
verse possession, if it existed, applied only to the 14-foot

strip south of lot 15, and was not limited to the bound-
aries of the strip, but co-existed with the possession of
lot 15 and was a part of the possession of lot 15. Carrie
C. Ely became the wife of James H. Ely on July 7, 1870.
From September, 1866, to the date of her marriage she
had been an inmate of his family. About a year after
her marriage, that is to say, about July, 1871, Ely deeded
lot 15 to her. She swears: "After we were married he
deeded it to me; I owned lot 15 as my home; about one
year after we were married." But Ely did not convey to
her the strip, 14 feet wide, lying south of and adjoining
lot 15. Whether in 1871 Ely had been in such possession
of the strip, as is above described, since 1862 or since
1866, his possession had not continued for twenty years.
Whatever interest he may have had in the strip in 1871,
was severed from the ownership and possession of lot 15
by the deed of lot 15, which he then made to his wife.
After that date she owned lot 15, and involved in her
ownership was the right of possession. (*Harding* v. *Fuller*,
141 Ill. 308). It may be that, if Ely had kept the owner-
ship and exclusive possession of lot 15 for twenty years,
and, during all that time, the strip south of lot 15 had
been enclosed with it, he would have acquired title by
an adverse possession for twenty years. But the proof
does not disclose any such state of facts. After the lapse
of five, or, at most, of nine years, there was an interrup-
tion in the running of the statute by the change made in
1871 of the ownership and possession of lot 15.

It is well settled that the twenty years' possession,
which must be shown in order to secure the title to prop-
erty as against the holder of the paramount title, must
be open, notorious, actual, adverse, visible and exclusive,
and it must also be continuous and continued under a
claim of right. The possession must continue uninter-
ruptedly for twenty years, and must be hostile in its in-
ception and in its character. (*Ambrose* v. *Raley*, 58 Ill. 506;
Angell on Limitations, sec. 390; *Wright* v. *Stice*, 173 Ill.

571; *Shaw* v. *Schoonover*, 130 id. 448). It is an essential element of an adverse and hostile possession that it shall be inconsistent with a possession, or right of possession, by another. A mere permissive possession, which is entirely consistent with the title of another, cannot ripen into a title by adverse possession, however long it may be continued. (1 Am. & Eng. Ency. of Law,—2d ed.—p. 794; *Wright* v. *Stice, supra*). It is also well settled that, where possession alone, in the absence of paper title, is relied upon for any legal purpose, it must be a *pedis possessio*, an actual occupancy of the premises in question, and not a mere constructive possession. (*Norris* v. *Ile*, 152 Ill. 190).

Whenever an occurrence takes place, which operates as an interruption of the running of the statute, the twenty years' possession must begin from the time of such interruption. (1 Am. & Eng. Ency. of Law,—2d ed.—pp. 835, 837).

After Ely conveyed lot 15 to his wife, the possession of lot 15 was hers. Not only did the constructive possession follow her title, (id. p. 822), but she was in the actual, open and visible possession of lot 15. If Ely thereafter had any possession, it was subordinate to her possession, and was not exclusive, but merely permissive. Thereafter he had no actual possession of the strip, 14 feet wide, south of lot 15, because that strip was unenclosed on the north side of it. "An enclosure on three sides by a wrongdoer is insufficient as against the real owner." (Angell on Limitations,—5th ed.—sec. 395; *Armstrong* v. *Ristean*, 5 Md. 256). The possession, which his wife had of lot 15, could not be joined to his incomplete possession of the strip south of it, in order to constitute an adverse possession by him alone of the strip. So far as the enclosure of the strip with lot 15 gave notice to the world of an adverse possession, it gave notice of such possession in Carrie C. Ely, and not in James H. Ely. The predominant possession, which overlapped the strip, if it did overlap it, was in her, and not in him. "The posses-

sion to be effectual must be exclusive, not only of the owner, but of all other persons." (1 Am. & Eng. Ency. of Law,—2d ed.—p. 834). His possession of the strip was not exclusive of his wife, because he had no possession thereof, except so far as he used his wife's possession of lot 15 to help out his alleged possession of the strip. "There cannot be two possessions of the same land at the same time." (Ibid. p. 822). "There must be continuity in point of locality as well, for possession of part of a tract of land cannot be joined to the possession of another part so as to make up the period." (Ibid. p. 835).

Nor can it be said that Mrs. Ely had possession of the strip, 14 feet wide, for twenty years. The proof does not show, that either she or her husband had possession of the strip for twenty years after July, 1871, when she received the title to lot 15. Whatever possession her husband had of the strip before July, 1871, could not be tacked on to whatever possession she may have had after that date, in order to make an adverse possession of twenty years. There must be privity of estate or title before the several possessions of successive disseizors can be joined together, so as to be regarded as a continuous possession. Acts of possession at different times by different persons, between whom there is no privity, furnish no support to each other. (Ibid. pp. 842, 843). "It is well established that, where several persons enter on land in succession, the several possessions cannot be tacked, so as to make a continuity of possession, unless there is a privity of estate, or the several titles are connected." (Buswell's Lim. & Adv. Poss. sec. 239).

In the case at bar, there was no privity of estate, or connection of title, such as exists between vendor and vendee, because, as has already been stated, the deed made by Ely to his wife conveyed only lot 15, and did not convey the strip south of it. If his deed had included the strip, then his possession before the deed could have been joined to her possession thereafter, if she had any.

It is unnecessary to consider the question whether the privity, required to constitute continuous adverse possession, can be effected by a parol agreement or understanding in the absence of any paper evidence of a transfer of possession, because there was no such parol agreement here. It cannot be said that the transfer of lot 15 to Mrs. Ely was intended by her husband to carry with it to her the possession of the strip in question, because the contention of appellants and their counsel is, and the statements made by their witnesses are, that Ely, and not his wife, had the possession for twenty years. It was evidently his intention to try to get for himself the title to the strip between the north 20 acres and the south 60 acres. He attempted to buy a portion of this strip at a tax sale held on December 3, 1870, for the non-payment of the taxes of 1869, and obtained a tax deed therefor, dated September 29, 1873. He was collector of the town of Hyde Park in 1868, 1869 and 1870, and before that was assessor for one term. He stated to one of the witnesses that he had had the surplus between the two subdivisions assessed in his own name, when he was assessor. His tax deed was certainly void, because, under the Revenue law which existed at that time, he, being collector, had no right to purchase the land at tax sale. Section 12 of the Revenue act, then in force, provided that: "No collector * * * shall be either directly or indirectly concerned in the purchase of any tract of land or town lot sold for taxes under the penalty of $100.00." (Gross' Stat. of 1871, p. 575).

If Mrs. Ely had any possession, it only began in July, 1871, inasmuch as she received no transfer, either written or oral, at that time, which entitled her to the benefit of her husband's previous possession. Lot 15 was sold in 1885 or thereabouts under the foreclosure of a mortgage theretofore given by the Elys, and was purchased by one Talcott, who thereafter became the owner of the lot and the house thereon. Mrs. Ely and her husband surren-

dered possession of the lot to Talcott in August or September, 1885, and twenty years had not then elapsed since 1871. The proof does not show such a possession of the strip after Talcott took possession in 1885, as constitutes an adverse possession within the meaning of the statute. At any rate there was a break in the possession at that time, which stopped the running of the statute. Talcott says that, when he went there, "there were remains of an old fence, part picket, part board, and part of it was down;" and that he rented the premises to a tenant, and "soon after the fence was all down." The fence referred to was evidently the fence, which had formerly been on the south side of the strip, 14 feet wide, here in controversy. No deed was made of this strip to Talcott, and he supposed for several months after his purchase, that lot 15, which he had bought, ran down to the remains of this old fence, until Ely came to him, and claimed the strip, and offered to quit-claim it to him for $100.00. He subsequently built a new fence, not on the line of the old fence, but 14 feet north thereof on the south line of lot 15. He removed this fence afterwards, when, as he says, "another fence was put up on the old line by Mrs. Ely, I suppose; I then took my fence down and enjoyed the privilege of this 14 or 15 feet." The Elys never fenced in the whole of the strip after the sale to Talcott in 1885, and, so far as it was enclosed at all, it was enclosed with lot 15, which was occupied by Talcott; and, thereafter, if it was in the possession of anybody, it was in Talcott's possession. Talcott does not claim any ownership, or interest whatever, in the strip, as we understand the evidence.

In 1871 Ely had only been in possession, if at all, for five or nine years. After 1871 he had no adverse possession, because the strip was not enclosed on more than three sides thereof, and he had parted with such possession, as he had derived from the enclosure of the strip with lot 15, by parting at that time with his ownership

and possession of lot 15. If Mrs. Ely had any possession, it began in 1871, and ended in 1885, a period of only fourteen years. Even if her alleged possession lasted until 1888, as is claimed by counsel, twenty years had not then elapsed since 1871.

*Third*—The appellants rely upon the tax deeds mentioned in the statement preceding this opinion, as showing good title to the strip or strips claimed by them. The tax deeds relied upon are all invalid. The tax deed of September 29, 1873, is admitted by appellants' counsel to be invalid on account of the defective description contained in it. It describes ground in the south-east quarter of section 10, whereas the property here in controversy is in the south-west quarter of that section. Moreover, the deed is invalid because it was issued to a man, who was collector at the time of the tax sale, upon which the deed is based.

The tax deed of October 14, 1882, executed to Mrs. Johana Mackey, is invalid for the following reasons: The deed of October 14, 1882, was issued because of a sale on October 1, 1880, for the taxes of 1879. Johana Mackey, the purchaser at the sale of October 1, 1880, suffered a sale to be made on September 1, 1882, of 28.88 feet north of Jennings & Moffett's subdivision and south of Elisha Bayley's subdivision, which would necessarily include the 14 feet north of Jennings & Moffett's subdivision, sold on October 1, 1880. Section 211 of the Revenue act provides, that "if any purchaser of real estate sold for taxes or special assessments shall suffer the same to be forfeited to the State or again sold for taxes or special assessment before the expiration of the last day of the second annual sale thereafter, such purchaser shall not be entitled to a deed for such real property until the expiration of a like term from the date of the second sale or forfeiture." Therefore, Johana Mackey was not entitled to a deed, under section 211, until after two years from the sale of September 1, 1882, whereas her deed was issued on Octo-

ber 14, 1882, some twenty-three months before she was entitled thereto. In other words, a sale of the strip having been made October 1, 1880, and another sale thereof having been made on September 1, 1882, two years did not intervene after the first sale before a second sale was made, so that any deed made before the expiration of two years after the date of the last sale was invalid.

The deed made on January 2, 1885, based on a sale of September 1, 1882, for the taxes of 1881, and also for the back taxes of 1880, was invalid for the following reasons: In the first place, the tax deed dated in January, 1885, based upon both sales, was not recorded until September 24, 1885, more than a year after the time for redemption expired, the time for redemption having expired on September 1, 1884. Section 225 of the Revenue act provides, that: "unless the holder of the certificate for real estate, purchased at any tax sale under this act takes out the deed, as entitled by law, and files the same for record within one year from and after the time for redemption expires, said certificate or deed, and the sale on which it is based, shall from and after the expiration of such one year be absolutely null." In the second place, the taxes of 1881 and the back taxes of 1880, for which the sales were made, had been paid before the sale. The taxes on the 14 feet were paid August 8, 1882, by P. E. Stanley, and said 14 feet was a part of the 28.88 feet which was sold for the taxes of 1881. In addition to this, the taxes of 1880 on lot 1, which embraced the greater part of the strip in question, were paid by Edwin Lee Brown on April 27, 1881, and the taxes of 1881 were paid by Brown on April 29, 1882. The taxes having been paid in advance of the sale it was improper to sell the land.

The bill alleges, and the proof shows, that James H. Ely and wife executed a trust deed to Seth M. Dunning on December 13, 1887, conveying said strip 14 feet wide, as above described. The tax deed of September 29, 1873, to James H. Ely having been void, the trust deed to

Dunning was also necessarily void, and was properly removed as a cloud.

*Fourth*—The bill charges, that a certain subdivision, called the "county clerk's subdivision," which shows a strip designated as lot 25, was void, and a cloud upon the title of appellees. We are of the opinion that this subdivision was wholly invalid. Sections 62 and 63 of the Revenue act provide that, in a certain event, it shall be the duty of the owner of a tract or lot of land to cause the same to be surveyed and platted into lots, and that if such owner refuses so to do after being notified by the county clerk, the clerk shall cause such survey to be made and recorded. Said section 62 directs that such plats, when made by the owner, shall be certified and recorded, and the plain intention of section 63 is that, when such plat is made by the county clerk it shall also be certified and recorded. Here, the subdivision made by the county clerk has no certificate whatever. In addition to this, section 1 of chapter 109 of the Revised Statutes, entitled "Plats," requires that where a subdivision is made the plat shall particularly describe and set forth all the streets within, adjoining or adjacent to the land divided, giving the names, widths, courses and extent of such street, etc. Lot 25, so-called, as shown on the alleged county clerk's subdivision, extends from South Park avenue to Indiana avenue, and includes a part of two public streets, to-wit, Calumet and Prairie avenues, but does not mention such streets, nor give the names, widths, courses or extents thereof.

*Fifth*—We do not understand counsel for appellants to insist upon the possession and payment of taxes for seven years under claim and color of title by the appellant, Carrie C. Ely, of the strip 14 feet wide, although the answer sets up such a defense and some reference is made thereto in one of the numerous briefs filed by counsel. The period of seven years referred to must be a period of seven years following January 25, 1888, after the quit-

claim deed from Walter S. Maher and wife to Carrie C. Ely was executed. Mrs. Ely did not pay the taxes for seven years after January 25, 1888, or, if she did so, she paid the taxes for seven years during that period after the same were paid by Edwin Lee Brown. For instance: the taxes of 1888 on lot 1, which included the 14-foot strip, were paid by Brown on July 1, 1889, and, if such taxes were paid by James H. Ely they were not paid until July 12, 1889. Brown also paid the taxes of 1891 on lot 1 on April 21, 1892, while, if such taxes were paid by James H. Ely, they were not paid until April 22, 1892. Therefore, the defense of seven years' possession and payment of taxes under the quit-claim deed of January 18, 1888, as color of title, is not made out.

*Sixth*—It is furthermore contended by appellants that the decree below did not require the appellees to refund to the appellants all the taxes which had been paid by them. The decree finds, and the proof shows, that Edwin Lee Brown paid all the taxes upon lot 1 from 1872 up to the date of his death, and that his devisees have paid all taxes upon the property since that time. Inasmuch, therefore, as the appellees and their ancestor paid all the taxes upon lot 1, which included the strip in question, equity does not require that they should be decreed to pay such taxes a second time. It is true that for some years taxes were paid by the appellants upon the strip in question by another description than that by which the payments were made by Brown and the appellees, but the appellees and Edwin Lee Brown were not responsible for such payment of taxes by the appellants.

The property upon which most of the taxes were paid by appellants or either of them was described as "lot 25 in the county clerk's subdivision of unsubdivided lands," and as that subdivision was void, and as the title thereof is indefinite, as not indicating in what part of the east half of the south-west quarter the unsubdivided lands lie, the appellees cannot be required to refund taxes so paid

upon the property described in such an indefinite way and whose location is so uncertain. We do not think that in this particular case, in view of the circumstances already indicated, the trial court committed any error in not requiring the complainants below to refund the taxes paid.

We are of the opinion, that the decree of the court below, which found that Edwin Lee Brown at the time of his death, was seized in fee of said lots 1, 2 and 3, and which decreed that the tax deeds hereinbefore referred to, and the quit-claim deeds based thereon, and the trust deed to Dunning, and the county clerk's subdivision, were void and clouds upon the title of appellees, and that the same should be removed and vacated, was a correct decree. Accordingly, the decree of the circuit court of Cook county is affirmed.                    *Decree affirmed.*

Mr. JUSTICE BOGGS, dissenting:

Lot 15 was the homestead of James H. Ely. That lot and the 14-foot strip were fenced together without a cross-fence between them. Ely conveyed lot 15 to his wife, Carrie C. Ely. He remained in possession of said lot 15, living thereon with his grantee, his wife, as before the conveyance. He was the owner of an estate of homestead in the lot and was in possession. He was entitled to so remain in the possession thereof even if his wife, the grantee in the deed, had been disposed to oust him therefrom. There was, therefore, no real change in the actual character of his occupancy of the 14-foot strip. It is not essential, in any case, to actual occupancy of land, it shall be surrounded by a fence, or be fenced at all, for that matter. He and his wife afterwards conveyed a tract of land including the strip to Maher, who immediately re-conveyed the 14-foot strip to Mrs. Ely. She could, therefore, tack her possession to his possession. Occupancy of the strip was continued by her for such period of time as that, with the time of his possession, the full period of twenty years was completed.

I dissent also from the conclusion the tax deeds held by the complainant should be set aside by the decree without requiring the re-payment of taxes. The specific object to be obtained by section 62 of chapter 120 of the Revised Statutes, entitled "Revenue," is to secure correct descriptions of parcels of lands which cannot be described otherwise than by metes and bounds, in order such property may be legally assessed for taxation. Section 1 of chapter 109, entitled "Plats," was enacted for an entirely different purpose, namely, to provide for and regulate the subdivision of lands into streets, alleys, blocks and lots, for the purpose of laying out a town or making an addition to a city, town or village. The provision of this chapter entitled "Plats," relative to the description of streets, alleys, common and public grounds, etc., and the mode of certification and acknowledgment of the plat by the proprietor of the town or of the addition to a town, city or village, have no application to the platting and surveying of tracts or parcels of land under section 62 of the Revenue act. The certificate referred to in the Revenue act is that of the surveyor, only. The platting required by that act may be by order of the county clerk, without the concurrence—even against the will—of the owner of the land platted. (Revenue act, sec. 63.) The owner need not make any certificate, even if he causes the land to be surveyed, as section 62 declares it to be his duty to do. Whether platted under section 62 or section 63 of the Revenue act, the certificate required is that of the surveyor. ⋅ The description of the tract as lot 25 in the "county clerk's plat or subdivision" was not, in my opinion, void because it did not conform to the requirement of the act relating to the platting of a town or an addition to a city, town or village. Taxes paid thereon by that description should therefore have been ordered re-paid to the complainant.

CARTWRIGHT, C. J., and CARTER, J.: We concur in the foregoing dissenting opinion by Mr. Justice BOGGS.