## Christopher B. Bouton v. Robert Cameron et al.

## Christopher B. Bouton and James G. Wright v. Same.

1. DECREES—*On Conflicting Testimony.*—The presiding judge of the trial court, who sees the witnesses, hears their testimony and observes their demeanor while testifying, is, other things being equal, better qualified to pass upon their credibility than is a court of review, from the mere reading of their testimony in the record; and in analogy to the rule in cases at law, courts have adopted the rule in chancery cases, that where the chancellor hears the witnesses testify in open court his findings of fact will not be disturbed unless clearly and manifestly against the evidence.

2. AGENTS—*Not to Gain a Personal Advantage.*—An agent will not

be permitted to gain a personal advantage in the matter of his agency to the detriment of his principal.

3. ASSIGNMENTS—*Of Mortgages, When Subject to Defenses.*—The assignee of a trust deed in the nature of a mortgage takes it subject to all defenses which the grantor could make against the grantee, and he should for his own protection make inquiry of the grantor as to defenses existing, and as to whether there exists any reason why the amount secured should not be paid.

4. ACCOMMODATION PAPER—*Defined.*—A recognized definition of accommodation paper is, a negotiable or non-negotiable bill or note, made by one who puts his name thereto, without consideration, with the intention of lending his credit to the party accommodated.

5. SUBROGATION—*Not to be Invoked by a Volunteer.*—One who is only a volunteer can not invoke the aid of subrogation, for such a person can establish no equity. He must have paid on request, as a surety, or under some compulsion made necessary by the adequate protection of his own rights. The loaning of money to discharge a lien is not sufficient to subrogate the lender to the rights of the lien holder.

**Foreclosure.**—Appeals from the Circuit Court of Cook County; the Hon. HENRY B. WILLIS, Judge, presiding. Heard in this court at the March term, 1901. Affirmed. Opinion filed January 30, 1902.

HECKMAN, ELSDON & SHAW and LEE & HAY, attorneys for appellants.

MATZ, FISHER & BOYDEN, attorneys for appellees.

MR. JUSTICE ADAMS delivered the opinion of the court.

These are separate appeals from the same decree and have been consolidated for hearing and heard on the same record.

Appellant Bouton filed a bill to foreclose a trust deed executed by Robert Cameron and wife to Arthur C. Gehr, and appellant Wright filed a cross-bill in the cause, claiming under the trust deed, subject to the claim of Bouton. The cause has been heard twice in the Circuit Court. On the first hearing that court decreed in favor of the present appellants, but on writ of error from this court the decree was reversed and the cause remanded for reasons stated in our opinion in Cameron v. Bouton, 72 Ill. App. 264, to which opinion we refer for a partial statement of the cause. On the last hearing the court found that there was only $100 and interest due on the trust deed; the same being

the balance unpaid of $1,000 lent by appellee Gehr to Cameron, after the execution of the trust deed, and decreed accordingly. The cause was heard on the testimony of witnesses and other evidence in open court.

The main question on the present appeals is as to the actual authority which Gehr had to borrow money on the note and the trust deed executed to secure the same. Robert Cameron is about fifty years of age, and had some dealings with appellee Arthur C. Gehr, before the transactions in question. Gehr's father had been the confidential adviser of Mrs. Cameron, and he succeeded to that relation. Gehr testified that five or six years before 1893, he did business for Mr. Cameron, that he knew him since 1884, and Mrs. Cameron prior to that year; that his father had done business for Mrs. Cameron. The evidence shows that the Camerons had implicit confidence in Gehr, that they advised with him frequently in regard to their affairs, and kept many of their papers at his office. He was engaged in the real estate business, as his father had been. Such being the relation between the Camerons and Gehr, Robert Cameron sought Gehr's advice with regard to the purchase of a piece of property in the city of Chicago which it is sufficient to describe as the Barry avenue property. It seems from the evidence that there was a mortgage on the property running to one Troost, to secure payment of $5,000, and that Mr. Cameron, before going to see Gehr about the matter, had been negotiating for the purchase with one Scannel, who purported to represent the administrator of one Bruschke, deceased, to whose estate the property belonged, and who left minor heirs. Gehr told Cameron that the administrator could not sell the property, and that the better way was to purchase at the sale on foreclosure of the mortgage. Cameron was willing to pay $5,000 for the equity, and made an arrangement with Gehr to take care of the deal, as he says. Gehr, purporting to act as Cameron's agent, attended the foreclosure sale of the property, bid the amount of the mortgage debt, and became the purchaser.

He took the certificate of sale in his own name, and as soon as he received it he sold it to appellant James G. Wright for the amount of the bid, and paid the amount of his bid with the money received from Wright.

Cameron did not know, until about the time of the expiration of the period of redemption, of the assignment of the certificate of sale. He supposed that Gehr had it in his possession. He testified that the arrangement with Gehr was that he, Gehr, would furnish the money; that Gehr told him he would put the deal through, that he always had plenty of money to loan at six or seven per cent. March 2, 1893, an agreement was made between Arthur C. Gehr and Charles Kriewitz, signed " Arthur C. Gehr," " Charles Kriewitz, guardian of said minors." The agreement recites the decree of foreclosure of the Troost mortgage of the Barry avenue property, the advertisement of sale, the sale, and states that Gehr attended the sale and bid $10,000 for the property, on condition that he, Gehr, would pay the mortgage debt, costs, etc., being the sum of $4,918.43, on or before the expiration of the time for redemption, if said property should not be redeemed. It was, by the agreement, further agreed that Gehr should pay into the Circuit Court $5,081.57, being the balance of said $10,000, in excess of the amount to be paid to the master by him, on receipt of a certificate of sale, provided Gehr might retain from the last mentioned sum interest at the rate of six per cent per annum, and such other sums as he might find it necessary to pay for the taxes of 1892 and 1893 on said property, and for insurance, " to the payment of which the said Arthur C. Gehr hereby agrees to bind, and hereby does bind himself, his executors, administrators and assigns, provided, nevertheless, that the said property is not redeemed from the said sale at any time before the expiration of the time of redemption from said sale."

This contract was involved and considered by the Supreme Court in Bruschke v. Wright, 166 Ill. 183, and the court held that, for the benefit of the minors, there should be a resale of the property, and it was so ordered. This

was in accordance with the doctrine announced in Cheney
v. Roodhouse, 135 Ill. 257, 265, that the court will some-
times adopt unauthorized acts of a guardian, if beneficial
to the ward. The question whether the contract could be
specifically enforced as against Gehr, was not raised or con-
sidered in the case, and we think it clear that it could not.
First, the contract is the personal contract of Kriewitz.
He, as guardian, could not bind either the person or estate
of his wards. Sperry v. Fanning et al., 80 Ill. 371, 375;
Nichols v. Sargent, 125 Ib. 309.

The contract does not even purport to be a contract of
the minors, by their guardian. That Kriewitz could not,
as guardian, contract to sell or convey the real estate of his
wards, requires no argument. 2 S. & C.'s Stat. 1896, p.
2085, Sec. 19. The contract does not in terms purport so
to do. There is, perhaps, an implied contract on the part
of Kriewitz that the property would not be redeemed from
the sale, this being made a condition of payment by Gehr,
but Kriewitz was powerless to make such agreement. Such
being the circumstances, we think it plain that the contract
could not be specifically enforced against Gehr, and also
think that no recovery could be had against him in an
action at law for a breach of it. Gehr paid nothing on the
sale except $4,918.43, and nothing into the Circuit Court,
as provided by the agreement. Mr. Cameron testified, in
substance, that $6,000 was to be raised on the Wellington
street property (which was Mr. Cameron's lot, conveyed by
the trust deed,) when a clear title should be procured to
the Barry avenue property, in about fifteen months; that
Gehr said he had plenty of money then, and did not want
the property, but only security; that $5,000 was to be raised
on the Barry avenue property, if the Wellington street
property was not sold; that Gehr said this would be all
right, and he would so fix it; that Gehr told him it was not
necessary for him to attend the sale, and he did not; also
that Gehr told him they wanted him to pay $10,000 down,
but he would not, and in the latter part of March or 1st of
April, Gehr told him that he had the certificate of sale, and

that he, Cameron, did not learn of the assignment of the certificate to Wright till June, 1894.

April 1, 1893, Robert Cameron executed a note payable to Arthur C. Gehr & Co., under which name Arthur C. Gehr did business, for the sum of $11,000, with interest at the rate of six per cent per annum, payable semi-annually in gold coin of the United States, to secure payment of which Mr. and Mrs. Cameron executed a trust deed of two pieces of property situated in Cook county, viz., lot 4 in Lawrence Proudfoot's subdivision, etc., and lot 6 in the subdivision of lots 7, 8, 9 and 10, in Wrightwood, said Wrightwood being a subdivision, etc. This is the trust deed sought to be foreclosed by complainant Bouton and cross-complainant Wright, the appellants here. Lot 4, above mentioned, is the property of Mr. Cameron, and lot 6 is Mrs. Cameron's property, and the Circuit Court, on the first hearing of the cause, dismissed appellant Bouton's bill as against lot 6 of Mrs. Cameron. On writ of error from this court, Mrs. Cameron was not served nor did she appear, and the decree, in so far as it dismissed the bill as to her property, was neither reversed nor affirmed. Cameron v. Bouton, 72 Ill. App. 279.

The purpose of the trust deed, the reason for its execution, is thus stated by Gehr:

"About early in April, 1893, after I had made this contract with Mr. Kriewitz, I suggested to Mr. Cameron that in case of his death—that he should give me security for my being obligated to carry out this contract with Mr. Kriewitz for property that I was not buying for myself and did not want. He thought that was a proper thing to do."

Robert Cameron testified:

"The $11,000 note was given to secure Gehr against loss in case I might die, so as this property would not be left on his hands, and it was made out $11,000 in the place of $10,000; there was $1,000 to be spent on the house after I got possession of the property."

If, as we think, the contract between Kriewitz and Gehr was not binding on the latter, and could not be enforced either at law or in equity against him, then Gehr had not,

by the contract, incurred any obligation whatever, and needed no security on account of the contract, and he had not expended a penny of his own money in the purchase of the property at the foreclosure sale.

About two weeks after the execution of the trust deed Gehr loaned to Mr. Cameron the sum of $1,000, and the evidence is that Mr. Cameron paid that amount to Gehr, less $100, the last payment being $50, May 7, 1894. Cameron knew nothing of the loan by appellant Bouton until he received a letter from Tod, Bouton's agent or partner, of date May 5, 1894, which he testified he did not receive until the next day after the last payment. Therefore he was warranted in paying Gehr. McAuliffe v. Reuter, 166 Ill. 491.

We have thus stated the relation existing between Gehr and the Camerons, and Gehr's actions in reference to their affairs, because we think the facts stated important to be borne in mind in considering the question whether Gehr was authorized to borrow money to the extent to which he did, on the Cameron note and trust deed.

The following paper was executed by the Camerons on the day of its date, at their residence in the city of Chicago, no one being present at the time of its execution, except Mr. and Mrs. Cameron and Gehr:

"CHICAGO, May 3d, 1893.
ARTHUR C. GEHR, 114 DEARBORN STREET.

You are hereby authorized to borrow such an amount upon my note for $11,000, dated April 1, 1893, secured by a trust deed, as you may require. The said note was deposited with you to secure you from loss by reason of your having signed a contract for the purchase of the property on Barry avenue, for my benefit. I have received the sum of $1,000 on account of said note, and in giving you my consent to raising additional amounts on said note, I rely upon you to see that such amounts are paid promptly, though legally I authorize you to use said note for your benefit and accommodation at its face value, at your discretion.

ROBERT CAMERON,
SARAH F. CAMERON."

This document is extraordinary in view of the facts, and

exclusive of the testimony of what occurred at the time of its execution. One month and two days prior to its execution, the trust deed was executed, and Gehr and Cameron both testified that its object was to secure Gehr against any loss, in case of Cameron's death, which he, Gehr, might suffer on account of any obligation which he may have incurred by the contract with Kriewitz; yet the paper in question purports, in terms, to authorize Gehr to use the note for his benefit and accommodation, at its face value. Thus, in a little more than a month, the note and trust deed are diverted from their original purpose, and a use of them authorized which might deprive Mr. Cameron of financial ability to purchase the Barry avenue property, for the purchase of which he fully believed a valid and binding contract had been made by Gehr. Whether Gehr so believed, we think exceedingly doubtful. Gehr is an experienced real estate broker; that he has had numerous transactions in realty, is evidenced by the record; he testified that he told Cameron that the administrator of the Bruschke estate could not sell the property of the minors, and it seems incredible that he believed the guardian of the minors could sell it. The testimony of the Camerons is, in effect, that Gehr obtained their signatures to the paper of May 3d by fraud and deceit. The evidence as to what occurred at the time the paper was executed is substantially as follows: Robert Cameron testified:

"Gehr told me that he wanted to know if I would do him a little favor that morning, and I said I would if I could, and he said that he would like to use that note and the mortgage of mine for $1,500 for ninety days, and just about that time Mrs. Cameron came in, and I told her what Gehr wanted, wanted to use the note and mortgage for $1,500 for ninety days; and I says, 'You know Mr. Gehr better than I do, if you say it is all right I am satisfied;' and Mr. Gehr spoke up and he says, 'It would be quite an accommodation for me, Mrs. Cameron, if Mr. Cameron would let me use that note for ninety days for $1,500;' and she says, 'Well, Mr. Gehr, we owe you $1,000 now, and that would be only $500 more than what we owe you, and I certainly think you are good for $500.' 'Well,' I says, 'you are the

doctor, and if you say so, I am satisfied;' and then he spoke something about that there were some taxes and interest, or both, on the Lake View property of Walker's and his, and then he told Mrs. Cameron, after that was all talked about a little, that he had brought the contract up, and showed it to her; he had brought the contract up for the Barry avenue property, that he had signed with the guardian, and it was nice property, no trouble about it but what we would get it.    Then he said to me that he would like to have it in writing, to show that he was authorized to use this note for $1,500 for ninety days, and I said, ' All right,' and he asked Mrs. Cameron if she would get him pen and ink and some paper, and she went and got him the pen and ink and the paper, and after he had wrote out what has been written on the paper, he asked me to sign it, and I signed it, and after I had signed the paper, two or three minutes, he said, ' Well, Mrs. Cameron, I guess it would be better for you to sign it too;' and so Mrs. Cameron signed it.    I don't believe Mrs. Cameron read that paper.    I didn't; I couldn't if I tried to. Nobody else was present at that time besides myself and Mrs. Cameron.    Gehr didn't read that paper to me, nor to Mrs. Cameron in my presence."

The evidence is that Mr. Cameron could not read writing and could not write except to sign his name.    Gehr, himself, so testified.    Mrs. Cameron testified :

" When Gehr came there, I guess Mr. Cameron let him in, and I came in in a few minutes, and spoke to him, and asked him how he was, and such as that.    Then I went out again of the room in a few minutes, and I come in again, and Mr. Cameron spoke to me and told me what Gehr wanted, that he wanted the loan of $1,500—used those words.    That was in Gehr's presence, and Gehr told—they both told me at the same time; they both told me about it. Gehr said that he would like to use those papers for $1,500, and of course I didn't know that he could use them for any more but the $1,500.    Mr. Cameron said, ' Would it be all right?' and I said, ' Yes, we owed him $1,000 now, and that surely we could trust him for $500 more.'    So we told him yes, that he could do it.    And then he asked me for paper and pen and ink, and I brought it, and he wrote this paper, and Mr. Cameron signed it.    I didn't read the paper; there was nothing said about the reading of it; Gehr didn't read the paper to me.    Gehr told me that the paper was for getting, so that he could get the $1,500.    Gehr stayed there, it

might be twenty minutes or half an hour; might be half an hour.  Something further was said by Gehr in reference to the Barry avenue property.  He talked a little about that, because that was what Mr. Cameron and him was talking about when I went in; and he brought up some kind of paper, contract or something, I don't exactly remember what it was.  I gave it to you; I think you have it because Mr. Cameron took it back and gave it to you afterwards.  Gehr said that was the contract for the Barry avenue property, and that we were going to get it, and such things as that.  I don't remember exactly just what he did say, but that is what—I can't remember the very words he said.  I don't know whether anything was said with reference to the certificate at that time; he might have said it, but I don't know; but he brought this paper up and I thought it was the Barry avenue property.  In reference to this $1,500, something was said about the time by Gehr; it was for ninety days."

Gehr testified as follows :

" But on the 3d of May, 1893, I went out to Mr. Cameron's house on Lill avenue, near Lincoln avenue, and told him that I wished to borrow some money upon that note, and asked him if I might do so, and he said ' Certainly.' Mrs. Cameron was also there.  I told him that alone.  I wished to have that authority in writing to show any one to whom I might make application for the money.  A piece of paper was brought to me.  I could not say whether it was brought by Mr. Cameron or his wife.  They were both present.  The conversation was on the first floor of Mr. Cameron's house.  I don't remember whether it was the front or rear room.  I wrote the paper that has just been handed to me, and that is marked Exhibit C, Cross-Complainant.  I wrote the paper and then read it to both Mr. Cameron and his wife, and it was then signed by Robert Cameron and his wife.  I don't remember whether we were all sitting there in the room, but they were both there.  I didn't have it with me before I went.  I wrote it in the house.  The paper was brought me, and also pen and ink, and the paper was then signed ·by Mr. Cameron and Mrs. Cameron, and these are their signatures."

Gehr further testified :

" I recollect stating, among other things, to Mr. Cameron that I wished to use a part of this money on account of that Lake View property, in which I had an interest, and of

which he had heard, and that there was some interest due, that there were interest and taxes due, and that it was not convenient, at that time, for Mr. Walker, who was interested in the property, to make payment."

On cross-examination Gehr testified:

"About the time that I obtained the paper of May 3, 1893, there was certain interest falling due on the Lake View property on a loan of $20,000—on a part of it, and a loan of $5,000 on the balance. Those loans did not bear the same interest. The $20,000 bore seven per cent interest and the $5,000 bore six per cent interest. The interest that was coming due about this time was about $700 on the $20,000. This was a piece of property in which Mr. Walker and I were interested. I think I informed Mr. Cameron of the fact that $700 of interest was coming due about that time. I think I told him that that was one of the matters on which I might want to have some money. I said that there were moneys due for taxes and interest, and that I could not recall whether I mentioned them to Mr. Cameron at that time, but that I thought I did, although I could not be positive. I think the taxes that year were between $500 and $600."

The interest on the $20,000, $700 plus taxes—$600—is $1,300. The interest on the loan of $5,000 is not stated by Gehr, but it may have been at least $200. His immediate need of money, according to his own testimony, was to pay the interest due on the loans, and the taxes mentioned, and this, with other circumstances, tends to corroborate the testimony of the Camerons. Gehr testified that in the conversation with the Camerons at the time when the May 3d paper was signed, nothing was said about $1,500 or ninety days.

It would seem from Gehr's testimony that he attached but little weight to the paper. In his direct examination he testified:

"The authority signed May 3, 1893, was in the files in my office, and I never had occasion to look for it, from the date it was signed until along in the summer of the following year (1894), when I was told, for the first time to my knowledge, that I had no authority to use the paper. Mr. Matz told me that, and I told him that I had authority in

writing and would look it up. It was in the vault among a bundle of old papers."

J. Joseph Wright, son of appellant Wright and confidential clerk of Gehr, and thoroughly familiar with Gehr's business, including his agency for Cameron, questioned Gehr's authority to borrow money on the Cameron note and trust deed, and even after the paper of May 3, 1893, was exhibited to him by Gehr, he refused to comply with Gehr's request to ask a loan from his father on the security of the note and trust deed, although his father had money to lend on good security.

Gehr, about the time of procuring the May 3d, paper, executed to Mr. Cameron an assignment of the agreement with Kriewitz, in which assignment the following occurs:

" I agree that, upon the delivery of the within master's deed, I will convey said land to Robert Cameron, who has delivered to me his note for $11,000, secured by trust deed upon land in Cook county."

This, although the certificate of sale had passed from his hands and control by assignment to Wright, of which he well knew. Cameron was ignorant, and so kept by him, Cameron's agent, designedly. Had not Cameron been thus hoodwinked, had he not been ignorant of the " by-paths and crooked ways " to which Gehr resorted to accomplish his own selfish ends, it is extremely improbable that he would have consented to Gehr's borrowing a dollar on the security of the note and trust deed. On the hypothesis that, in equity, and so far as the rights of third persons are concerned, it must be held that the Camerons authorized Gehr to borrow $1,500 for ninety days, on the security of the note and trust deed, that authority was more than exhausted by his borrowing from Frederick Straus $6,000, which he did May 20, 1893, giving his own sixty-day note and pledging the Cameron note and trust deed as security. It is somewhat remarkable and significant that Gehr did not exhibit to Mr. Straus the paper of May 3, 1893, which he claims as authority to borrow on the security of the note and trust deed, without limitation as to amount. This was,

perhaps, because the paper contains the following sentence, which was likely to excite suspicion and result in failure :

" The said note was deposited with you to secure you from loss, by reason of your having signed a contract for the purchase of the property on Barry avenue, for my benefit."

This was another instance of Gehr's want of confidence in the paper.

July 19, 1893, the day next before the day when Gehr's note to Straus fell due, he called on Straus and informed him that he would not be able to pay the whole amount of the note when due, but would pay $2,000 of the amount, which he did. Straus refused to extend the time of payment unless Gehr would bring Cameron to him, and Cameron would make a statement satisfactory to him that the signatures to the note and trust deed were genuine, that he, Cameron, had no offset or counter-claim, and that Gehr could use the paper as collateral security.

About July 27, 1894, at the office of Mr. Wertheimer, Straus' attorney, Gehr, Mr. Cameron and Straus being present, the following document was signed by Mr. Cameron :

" CHICAGO, July 27, 1893.

I, the undersigned, Robert Cameron, do hereby declare that I did, on the first day of April, 1893, execute one promissory note, payable one year after date, to the order of myself, and by me indorsed, in the principal sum of $11,000, with interest thereon at the rate of six per cent per annum, payable half-yearly on the first day of October and April, in each year, without grace, at the office of Arthur C. Gehr & Company, in Chicago, interest evidenced by two coupon notes, of even date; that said sum of $11,000 was paid me by Arthur C. Gehr & Company, and that said Arthur C. Gehr & Company, upon the execution thereof, became the owners of said note and coupons, and had full authority to negotiate, or otherwise dispose of the same, for their own use and behoof.

Said note and interest aforementioned is secured by trust deed executed by me, on real estate in Cook county, which said trust deed bears document number 1,843,226, recorded April 5, 1893, in book 4289 of records, page 36.

ROBERT CAMERON."

As to the circumstances which resulted in the signing of this paper, Wertheimer testified :

" Mr. Straus came to me and said he was not wholly satisfied as to the way in which Gehr had met his promises, and wanted to know about the right of Gehr to use those papers as collateral. I do not undertake to give the exact language. I told Mr. Straus that I would let Mr. Gehr know, and have Mr. Cameron come down to the office and meet Mr. Straus. This was done."

It appears from Mr. Cameron's testimony that he had not been informed of the Straus loan, and that when Herbert Gehr, appellee Gehr's brother, came to him and informed him that appellee Gehr wanted to see him, he asked Herbert what he wanted, and Herbert told him he didn't know, and then took him to Wertheimer's office. There is a conflict of evidence as to what occurred at the time the July 27th paper was executed. Wertheimer testified:

" Mr. Straus wanted to know whether Mr. Gehr was authorized to use the paper as collateral, and who was the owner of it, etc.; explained to him why we wanted to know that; from his answers I deduced the conclusions from which I dictated the document, and it contains substantially the answers given to me by Mr. Cameron and the questions put to him concerning the matter."

This witness further testified that he would not be certain whether he read the paper to Mr. Cameron, or whether he, Cameron, read it himself, but that he was convinced that Cameron knew its contents; that he would not say that he mentioned the amount of the note; that he would not undertake to say whether he stated the amount of the loan.

Straus testified:

" We explained to Mr. Cameron the substance of the reason for calling him up there—what the intention was, what we wanted to do, and on account of Mr. Gehr not being able to take up his note as agreed on. Mr. Cameron was satisfied; he said he was satisfied to make a statement in any way that we would think it was necessary, and Mr. Wertheimer dictated the statement in my presence, and the same was afterward signed by Mr. Cameron in my presence, and Mr. Wertheimer's presence and Mr. Gehr's presence. It was dictated in Mr. Cameron's presence, and I think it was read to Mr. Cameron by Mr. Wertheimer."

Gehr, appellee, testified :

" At the appointed time I went to Mr. Wertheimer's office in the Title & Trust building. Mr. Wertheimer and Mr. Straus were there. My impression is very strong that Mr. Cameron came in a few minutes later with my brother. I think it is barely possible that Mr. Cameron may have been there. But my impression is very strong that Mr. Cameron was the last one to come. That was the first time I had seen Mr. Cameron after this conversation with Mr. Straus, early in the morning. Mr. Wertheimer told Mr. Cameron that he wanted to inquire about a note that Mr. Cameron had signed—note and trust deed that I had pledged with Straus for a loan, and told him that as a business man he wanted to have proper information about all his matters, and asked Mr. Cameron if this was his signature to the note and trust deed. He told Mr. Cameron that I had not paid all that was due upon the note, and before granting an extension he wished to know that the note was all right. Mr. Cameron replied that it was his signature. The note and trust deed were in Mr. Wertheimer's office at the time. Mr. Straus then asked Mr. Cameron what he thought the property was worth. Up to that time the conversation had lasted about five minutes. Mr. Wertheimer then told Mr. Cameron that he wished him to make a statement in writing, of the condition of the matter, according to their talk, and dictated to a stenographer this paper marked Cross-Complainant's Exhibit A. Mr. Cameron was satisfied to sign it. He spoke to me regarding it. I told him it was all right. He did not ask me what it was, or anything of that sort. The paper had already been read, and I told him it was an acknowledgment by him that I had a right to use this note the same as the other acknowledgment that I had before."

Mr. Cameron testified :

" Mr. Gehr, Mr. Straus and Mr. Wertheimer were in that office. Herbert Gehr opened the door and I went in; he didn't go in; he went back again; and Arthur Gehr introduced me to Straus, who was next the door. Mr. Wertheimer was at the desk, the same as if he was over there (indicating). He introduced me to both of them, and Mr. Straus asked me if Mr. Gehr had a note of $11,000 belonging to me. I said he did. He asked me if he was authorized to borrow money on it, and I said he was. He asked me where the property was; I told him it was on Wellington

avenue, near the lake, and he asked me how much the property was worth, and I told him I thought it probably was worth $250 to $300, about that. He said he was up and looked at the property; said it was very nice property, and I said it was; it was good property, and some thought it was worth $325, but I thought it was worth about $300; I mean a foot. And Mr. Wertheimer handed me a paper about the time that conversation was through. He asked me to read it, and he would like to have me sign it. Gehr was sitting on the window, right across there (indicating). I took the paper in my hand and I walked over where Gehr was, and he got up off the window, and I asked him what this paper meant. He said that it was the same as my wife and I had signed at the house; that this was the people that he was getting the money from, and that they wanted to see the maker of the note and have him sign that paper. I signed the paper."

Mr. Cameron further testified that neither Wertheimer nor any one read the paper to him, and that nothing was said about Gehr having paid him $11,000, or about Gehr being the owner of the paper, and that he was at the meeting about five minutes; that neither Straus nor Wertheimer nor any one told him that Gehr had already borrowed money on the note and trust deed; that he had absolutely no conversation with Wertheimer, beyond his introduction to him; that the first time he saw the July paper, Wertheimer walked over to him with the paper in his hand and handed it to him, and told him to read it, and then he went aside to Gehr and asked him what it meant, but did not ask Gehr to read it. He, Cameron, also testified that he didn't ask anything about the loan from Straus, because he thought it was that $1,500 which he had given Gehr permission to borrow, and never thought it was for anything else.

On the execution of the July 27th paper, Straus extended the time for payment of Gehr's note, and Gehr, within thirty days from the date of the extension, paid to Straus the balance due on his note. In order to do this, however, he had to get another loan, for which he applied to appellant Bouton. August 17, 1893, appellant Bouton loaned to Gehr on his sixty-day note, and on the Cameron note and

trust deed, as collateral security, the sum of $5,000. It appears from the evidence that the amount named was very much needed by Gehr at that time. The first payment made by him on his note to Straus was a check of appellant Wright, which had been given him by Mr. Wright to make a payment on a piece of property which he, Wright, contemplated purchasing, and which check Gehr was accountable for to Mr. Wright. Gehr paid to Straus $1,000 in about twenty days from the date of the extension of his note to Straus, and still owed Straus about $3,000, making $5,000 in all, viz., $2,000 to Wright and $3,000 to Straus. It would appear that he had an inveterate habit of using the money and securities of his patrons and principals for purposes other than they were intrusted to him for.

It conclusively appears from the evidence, and is not disputed, that neither Mr. Bouton nor his agent, Mr. Tod, who acted for him in making the loan, saw either of the papers of May 3d and July 27th before making the loan. The paper of May 3d was, as Gehr testified, in his vault "among a bundle of old papers," and he had never seen it from the time it was signed until some time in the summer of 1894. Although he had been for weeks negotiating with Tod, first, with the view of selling the note and trust deed, and subsequently, for borrowing on them, as security, it never occurred to him to exhibit to Bouton or his agent, Tod, the May 3d paper. The July 27th paper was in Straus' possession, and Gehr could not obtain possession of that paper until he paid Straus, which he did from the money which Bouton loaned him. Tod testified that Gehr, after receiving a check for $5,000, left Bouton's office, and in about half an hour returned with the note and trust deed and the paper of July 27th. Mr. Bouton testified that he then saw that paper for the first time. The appellant Wright, like Mrs. Cameron, had done business with Gehr's father, and like her, he unfortunately continued the business with appellee Gehr.

March 16, 1894, Gehr borrowed from James G. Wright, evidenced by his judgment note of that date, payable March

17, 1894, the sum of $7,700, to secure payment of which he executed to Mr. Wright a certain paper purporting to be an assignment from him to Wright of a certain lease, a certain option contract, and Gehr's interest in the Cameron note and trust deed. The language of the document, as to the note and trust deed, is as follows:

" Also all right, title and interest in and to a certain note for the sum of $11,000, made by Robert Cameron and dated April 1, 1893, secured by a deed of trust recorded in the recorder's office of Cook county, Illinois, in book 4289 of records, at page 36, subject to an incumbrance or loan upon said note of the sum of five thousand dollars ($5,000), for which said note is pledged with Walter Tod & Co., of Chicago, Illinois."

Walter Tod & Co. was the name of appellant Bouton's firm. The assignment to Wright was, necessarily, by a separate instrument, the note and trust deed being in Mr. Bouton's possession at the time of the assignment. The assignment purports to be and was merely of Gehr's interest in the note and trust deed. What was his interest? As before stated, Gehr and Robert Cameron both testified that the note and trust deed were given to secure Gehr from any loss which he might suffer in the event of Cameron's death, by means of obligations which he may have incurred by his contract with Kriewitz. This also appears from the paper of May 3, 1893, in which it is stated:

"The said note was deposited with you to secure you from loss by reason of your having signed a contract for the purchase of the property on Barry avenue, for my benefit."

The note and trust deed, therefore, were in the nature of a bond for indemnity; and Gehr's sole interest in them was to be indemnified, by means of the note and trust deed, for any loss which he might suffer, as stated. Until he suffered such loss, he could not equitably sustain any action on the note, or foreclose the trust deed. It does not appear that he had suffered any such loss, and his contract with Kriewitz being unilateral and unenforcible against him, either at law or in equity, as we think, he can suffer no loss

by reason of that contract. Wright, his assignee, took no greater right than Gehr himself had. In our former opinion we said, in reference to the assignment in question:

"The assignment to Wright of Gehr's interest in the note, subject to the prior assignment to Bouton, was, as heretofore stated, by a separate instrument of date March 16, 1894, and was not such an assignment as is contemplated by Sec. 4, Chap. 98, of the Statutes, namely, by indorsement of the note. The assignment, therefore, was merely equitable, and Wright, the equitable assignee, took subject to any defense which Robert Cameron, the maker of the note, might have against Gehr. Osgood's Adm'rs v. Artt, 17 Fed. Rep. 575; Peck v. Bligh, 37 Ill. 317."

The chancellor found that Gehr had no authority to borrow from either of the appellants on the security of the Cameron note and trust deed. It is urged by counsel for the appellants that this finding is contrary to the evidence. The evidence on the question is conflicting and contradictory. In Shevalier v. Seager, 121 Ill. 564, the court states the rule of practice in the Supreme Court in common law cases, in which the evidence was conflicting, which obtained in that court prior to the enactment of the statute limiting the court to the decision of questions of law, and applied the rule to the verdict of a jury in a contested will case. The court, after citing numerous cases, the last cited being Ill. Cen. R. R. Co. v. Gillis, 68 Ill. 317, say:

"The case last mentioned contains, perhaps, as clear and apt a statement of the rule, if not more so, than any of them. It is there said: 'If any rule of court can be so well established as to be neither questioned nor require the citation of authorities to support it, it is that a verdict will not be set aside whenever there is a contrariety of evidence, and the facts and circumstances, by a fair and reasonable intendment, will authorize a verdict, notwithstanding it may appear to be against the strength and weight of the testimony.' In the later case of Calvert v. Carpenter, 96 Ill. 63, which, like the present, was a contested will case, the rule is formulated in fewer words, though in substance it amounts to the same thing. In that case, as in this, there was a direct conflict in the testimony as to the testator's capacity to make a will, and it was there said: 'This court will not reverse the judgment of the trial court where the

evidence of the successful party, when considered by itself, is clearly sufficient to sustain the verdict.' "

The reason stated for the rule in decided cases is, that the presiding judge of the trial court, who sees the witnesses, hears their testimony and observes their demeanor while testifying, is, other things being equal, better qualified to pass on the question of their credibility than is a court of review from the mere reading of their testimony.   In analogy to the rule in common law cases, the court has adopted the rule that in a chancery cause, in which the chancellor has heard the witnesses testify in open court, the findings of fact will not be disturbed unless clearly and manifestly against the evidence.   Burgett v. Osborne, 172 Ill. 227; Delaney v. Delaney, 175 Ib. 187, 199; Bloomstrom v. Dux, Ib. 435; Elmstedt v. Nicholson, 186 Ill. 580; Mayrand v. Mayrand, 194 Ill. 45, 49, and cases cited.

In McCormick v. Miller, 102 Ill. 208, the court say :

" If upon a careful consideration of the whole of the testimony bearing on the question, the reviewing court has a well founded doubt as to how the question should have been determined, without any clear conviction the one way or the other, the finding of the court below should not be disturbed."   Ib. 214.

In the present case we can not say that the finding of the chancellor is clearly and manifestly against the evidence.   The evidence disclosed by the record of Gehr's frequent violations of his duty as agent and betrayals of the trust reposed in him by the Camerons, and his audacious attempt to sell outright to Bouton the note and trust deed, as testified to by both Bouton and Tod, and not denied by Gehr, were sufficient to discredit his testimony. Assuming the findings of the learned chancellor to be correct, and we can not say they are not, Gehr lied to the Camerons, lied to Bouton, lied to Wright, and when, at the maturity of the Bouton loan, Cameron first learned of its existence, and Gehr then claimed having had authority to borrow from Bouton on the security of the note and trust deed, Cameron indignantly told him he was a liar.   For an agent to gain a personal advantage in the matter of his

agency, to the detriment of his principal, is something the law will not tolerate. Story on Agency, 9th Ed., Sec. 210; Mechem on Agency, Sec. 454, *et sequens.*

The law being that the assignee of a trust deed in the nature of a mortgage takes subject to all defenses which the grantor could make against the grantee, Bouton and Wright should, for their own protection, have inquired of the grantor, Cameron, whether he had any defense as against Gehr—whether there was any reason why the amount secured by the trust deed should not be paid. Olds v. Cummings, 31 Ill. 188; McAuliffe v. Reuter, 166 Ib. 491, 496; Buehler v. McCormick, 169 Ib. 269, 275.

The evidence shows that before Bouton accepted the note and trust deed as collateral to Gehr's note, he was informed that they were made and executed by Mr. Cameron. Cameron lived in Chicago and was easily accessible, which is evidenced by the fact that he received Tod's letter notifying him of the maturity of the Bouton loan. J. Joseph Wright, who acted for appellant Wright in making the Wright loan, was, as before stated, Gehr's confidential clerk, and knew Cameron well. There is, therefore, no excuse for the appellants' omission to inquire of Cameron.

But appellants contend that the note was an accommodation note, and therefore the doctrine announced in Olds v. Cummings, and adhered to in subsequent cases, has no application, citing Miller v. Larned, 103 Ill. 562.

The note in question was not intended or given as an accommodation note. It and the trust deed purporting to secure it were, as we have shown, to secure Gehr against loss by reason of his contract with Kriewitz. They were intended to subserve the purpose of an indemnifying bond. It can not be claimed that Gehr could have legally sold them or borrowed money on them prior to May 3, 1893. The consent of the Camerons that Gehr might temporarily use the note and trust deed as security for a loan of $1,500 for ninety days, did not, in our opinion, make the note accommodation paper for all purposes. When the authority so given was exhausted by the loan from Straus, the paper

stood as it did originally, viz., as security to Gehr against loss. Miller v. Larned, *supra*, has no application to the facts of the case, as found by the trial court. In that case the court say, " A recognized definition of accommodation paper is, either a negotiable or non-negotiable bill or note, made by one who puts his name thereto, without consideration, with the intention of lending his credit to the party accommodated;" and the court held that the notes involved in that case were accommodation notes *ab initio*, and were so understood to be by the parties to them.

Counsel for appellant Bouton contend that their client should at least be subrogated to the rights of Straus, in so far as the money loaned by Bouton was used in payment of Gehr's indebtedness to Straus. We can not sustain this contention. In 2 Beach on Mod. Eq. Jurisp., Sec. 801, the author writes :

"But one who is only a volunteer can not invoke the aid of subrogation, for such a person can establish no equity. He must have paid on request, or as surety, or under some compulsion, made necessary by the adequate protection of his own right. * * * The loaning of money to discharge a lien does not subrogate the lender to the rights of the lien holder."

Bouton was a mere volunteer. He did not advance the money to Gehr for the protection of his, Bouton's, interest. He had no interest to protect; and, certainly, was under no compulsion to make a loan to Gehr. Under such circumstances he can not claim the right of subrogation. Hough v. Ætna Life Ins. Co., 57 Ill. 318; Young v. Morgan, 89 Ib. 199; Pearce v. Bryant Coal Co., 121 Ib. 590, 597; White v. Cannon, 125 Ib. 412, 416; Bank, etc., v. Union Trust Co., 149 Ib. 343; Home Savings Bank v. Bierstadt, 168 Ib. 618; Fuller v. Davis' Sons, 184 Ib. 505, 513.

We can not understand how the doctrine of subrogation can be applied to the facts of this case.

Counsel for appellant Bouton further contend that the court, under the prayer for general relief, should have rendered a personal decree against Cameron on the $11,000 note for the difference between the amount for which the

decree of foreclosure is and the amount due on the note. If, as the court found, Gehr had no authority to pledge the note as collateral security, then, in equity, Bouton had no right, as we think, to such decree. But even on the hypothesis that a recovery might be had at law on the note, and that the court might have administered a purely legal remedy, by a personal money decree against Cameron, it by no means follows that the court was bound to so do.

It is claimed in favor of Wright, that his son, J. Joseph Wright, who acted for him in the examination of the securities, saw the papers of May 3d and July 27th. J. Joseph Wright took the acknowledgment of the trust deed by Mr. Cameron and wife, and knew well the object for which it was made. That object, too, is plainly stated in the May 3d paper. His knowledge of the purpose of the trust deed, together with the discrepancy between the papers of May 3d and July 27th, the former stating the trust deed was to secure Gehr against loss, and the latter that Gehr had paid to Cameron $11,000, which Wright, Jr., knew to be false, were circumstances clearly suggesting inquiry of Cameron. Yet he made no such inquiry. Had Bouton and Wright inquired of Cameron before parting with their money, as it was their duty to do, Cameron, unquestionably, would have informed them of the facts, and they would not have been victimized by Gehr. Bouton testified that in conversation with Cameron, after Cameron had been notified of the loan and its maturity, he told him, Bouton, that he gave the trust deed for the purpose of securing Gehr; that he and Gehr had some business transactions in regard to real estate; and Cameron testified that Bouton asked him how Gehr came to get the note, and he told Bouton about the Barry avenue deal, and that the note was given to Gehr to secure him against loss, if he, Cameron, should die, on account of his putting that deal through; that he told Bouton the whole story from beginning to end, and Bouton said it was too bad, and that he was sorry for him. Can there be any doubt that if such inquiries had been made of Cameron by the appellants

before lending their money on the faith of the Cameron note and trust deed, they would have received like information?

We believe, from inspection of the entire record, that substantial justice has been done, and in each of the appeals the decree will be affirmed.