CLYDE DORSEY *et al.*, Petitioners-Appellants, *v.* RAY RYAN *et al.*, Respondents-Appellees.

Fourth District    No. 4—82—0264

Opinion filed November 30, 1982.—Rehearing denied December 28, 1982.

Presney, Huffman, Kelly & Appleton, of Springfield, for appellants.

Eddie Carpenter, of Bellatti, Fay, Bellatti & Beard, of Jacksonville, for appellees.

PRESIDING JUSTICE GREEN delivered the opinion of the court:

Petitioners, Clyde and Dorothy Dorsey, are the fee owners of a tract of land situated in Morgan County, whose southern boundary with respondents has been disputed for some time. Petitioners' parcel is described in their deed as "[b]eginning at the Northeast corner of the West half of the Southwest quarter of said Section Seven (7), and running thence West 80 rods, thence South 44 rods, thence East 80 rods and thence North 44 rods to the place of beginning, containing 22 acres, more or less."

On May 1, 1980, petitioners filed suit pursuant to section 2 of "An Act to provide for the permanent survey of lands" (Ill. Rev. Stat. 1979, ch. 133, par. 12) which creates a procedure whereby persons whose corners and/or boundaries are lost, destroyed, or disputed, and who are unable to reach agreement may petition the court for the appointment of a commission of surveyors to assist the court in finally resolving the boundary dispute.

Although respondents denied that the corners and boundaries

were in dispute, on September 29, 1980, following hearing on the petition, the trial court found that the corners were in dispute and agreed to the appointment of a surveyor. Instead of appointing the required three surveyors, however, the court appointed only one surveyor.

The survey was completed in December 1980 and was submitted to the court on April 6, 1981. Petitioners subsequently filed written objections to the plat of survey including, *inter alia,* their claims that the survey was not made in accordance with the original survey of 1820, that the survey placed reliance on improper monuments, and that a deficiency in the distance between the west section corners of 71 feet less than the recorded distance was not properly apportioned along the western section line of township 13 north, range 9 west, section 7.

At the hearing on the objections to the survey, John Garrison, the surveyor who performed the survey, testified regarding his methods. The surveyor stated that the starting point for the resurvey was the original government field notes. Using these as a basis, he proceeded first to attempt to locate in the field the original points called for in the notes. According to the surveyor, evidence of the original markers called for in the 1820 field notes for section 7 was not discovered. The notes of the government survey made in 1820 indicated that the southwest corner of section 7 was 236.9 feet or 3.59 chains north of the southeast corner of section 12, lying in the township to the west, and that the northwest corner of section 7 was 4.68 chains or 308.88 feet north of the northeast section corner of section 12. Garrison began on the range line dividing the two townships, measured north and south, and located two stones along the eastern border of section 12. Relying on older surveys which had referred to these stones, he concluded that these were stone monuments placed by county surveyors in the same location as the original government posts, though the distance between these corners did not correspond to the original measure. According to Garrison, the original field notes indicated that the distance of the eastern section line of section 12 was the standard mile, but, as measured by him, the distance between the two corners was 5,208.28 feet. The surveyor opined that the discrepancy was not due to an improper setting of the stone markers, but rather resulted from an error in the original government survey. He stated that he attempted to find the missing chain by retracing the range line north and south but to no avail.

By relying on the stone markers on the eastern corners of section 12, the surveyor located the section corners for the western side of

section 7. He then placed the quarter-corner 40 chains north of the southwest corner of section 7 as indicated in the original field notes. Garrison noted that the government measure for the western boundary of section 7 was 81.09 chains while on resurveying it was established that the section 7 line was 71.94 feet shorter than the original government measure. Ordinarily, according to the surveyor, standard survey procedure would require that the deficiency be distributed along the entire section line, but in this instance the surveyor made no attempt to divide the deficiency *pro rata* along the line.

At the conclusion of the hearing on the objections, the court accepted the survey. Petitioners then filed a motion for rehearing alleging that the survey was erroneous because the deficiency of 1.09 chains was never apportioned between the section 7 corners and that they had received an opinion from the Chief of Cadastral Survey, Bureau of Land Management of the Department of the Interior, which indicated that the 1.09-chain discrepancy on the western section line of section 7 should be apportioned along the entire length. Petitioners further objected to the survey because the surveyor did not find true north when he ran the lines described in their deed. On April 19, 1982, written final orders were entered directing petitioners to pay all surveying expenses and costs, approving the survey, and denying petitioners' motion to reconsider.

In petitioners' first argument on appeal, it is suggested that the trial court erred in accepting the plat of survey which established the quarter-section line of the disputed property. It is petitioners' contention that the original corner monuments were obliterated and sufficient effort to reestablish those corners was not made. Relying on the authority of *Irvin v. Rotramel* (1873), 68 Ill. 11, the petitioners suggest that the disputed line was not established by reference to a known government marker, while respondents contended in reply that adequate efforts were made to establish the corners and that the resurvey properly followed the original government notes.

The importance of the ascertainment of the original monuments is clear. Since the parties' land was conveyed with reference to the original survey of the public lands of the United States, the original monuments or the points at which they were placed control their property rights. (*Irvin.*) As noted in Clark, Surveying and Boundaries sec. 377, at 457 (4th ed. 1976), "[t]he lines, corners and boundaries of the survey of the public lands as returned by the chief cadastral engineer and approved by the Government are unchangeable." Even where a resurvey shows an error in the location of the original monuments, the latter are still controlling even if inconsistent with calls for direc-

tions and course in a survey. (*Ely v. Brown* (1899), 183 Ill. 575, 56 N.E. 181; Clark, Surveying and Boundaries sec. 298, at 367 (4th ed. 1976).) To properly establish the quarter-section line, the resurvey was dependent upon the location of the north and south section corners of section 7. Once these corners are located or reestablished, the quarter-section line can be readily determined since the field notes of the original survey indicate that the quarter-section corner is 40 chains north of the southwest corner of section 7.

In *Irvin*, the supreme court held that the object of the retracement of surveys is the reestablishment of lines according to the original government notes, and that to properly establish the interior lines of sections, it is first necessary to establish the exterior lines and corners of the section according to the original survey and notes.

In dispute in *Irvin* was the location of the dividing line between the west and east halves of the southwest quarter of section 21, township 4 south, range 4 east. There the evidence indicated that the original government posts had been located at the southeast corner of section 21 and the southwest corner of section 20. Rather than running straight lines between these corners and dividing the distance according to the government field notes, the appointed commission of surveyors began on the disputed quarter-point along the south section line of section 21 and measured north. This was held to be error, the supreme court stating:

> "It seems to us, before the commissioners could have correctly established this line, it was necessary first to establish the exterior lines and corners of the section according to the government survey and field notes, a copy of which every surveyor has or should have, and this can only be done, as the act declares, by referring to original government corners, or to stone corners or other monuments which have been in existence over twenty years, and recognized as original government corners by the adjoining proprietors." 68 Ill. 11, 15.

At bar, the disputed corner the parties were trying to locate was the quarter-corner on the township boundary line of section 7. The testimony of the surveyor indicated that no evidence of the original monuments was found and the surveyor proceeded to locate the line by reference to the standard corners on the range line. Although the parties do not suggest what method should have been used to ascertain the quarter-section line, the rule in *Irvin* is in agreement with the method suggested in the Bureau of Land Management's Manual of Instructions for the Survey of the Public Lands of the United States, which provides:

"All lost section and quarter-section corners on the township boundary lines will be restored by single proportionate measurement between the nearest identified corners on opposite sides of the missing corner, north and south on a meridional line or east and west on a latitudinal line." (U.S. Dept. of Interior, Bureau of Land Management, Manual of Instructions for the Survey of Public Lands of the United States sec. 5—34, at 136 (1973).)

We need not decide if this is the proper procedure, and it suffices to say that this rule also requires measurement from an identified corner. Though we note that section 5 of "An Act to revise the law in relation to county surveyors, and the custody of the United States field notes" (Ill. Rev. Stat. 1979, ch. 133, par. 5) requires all resurveys to be made in accordance with the law of the United States governing surveys, there appears to be no specific regulation or law applicable to the reestablishment of lost corners. See 43 U.S.C. sec. 751 (1976).

▉ As in *Irvin*, the surveyor seems to have placed reliance on the section corners of section 12 in the township adjacent to section 7, though the evidence clearly shows that these corners were neither original corners nor in agreement with the original field notes. While it is possible that the original measurement of the eastern boundary of section 12, township 13 north, range 10 west, was incorrect, still the presumption must be that the field notes and plats are correct until the contrary is clearly shown by the evidence. (*Ogilvie v. Copeland* (1893), 145 Ill. 98.) By placing reliance on the section corners of section 12 and then proceeding to ascertain the corners from there, the surveyor had concluded that an error was made originally, and not that the surveyor who placed the concrete monuments along the eastern line of section 12 improperly resurveyed the eastern boundary. This we conclude was improper.

▉ In holding as we do, we will not be understood to mean that lost corners must be reestablished by reference to original corners, for such a burden would often be an impossibility in view of the deterioration and loss of many original government monuments. Rather, we think that the authorities differentiate between three types of corners, two of which may be relied upon to ascertain a lost corner. In the manual previously referred to, three different types of corners are noted and defined:

"An existent corner is one whose position can be identified by verifying the evidence of the monument or its accessories, by reference to the description in the field notes, or located by an acceptable supplemental survey record, some physical evi-

dence, or testimony.

\* \* \*

An obliterated corner is one at whose point there are no remaining traces of the monument or its accessories, but whose location has been perpetuated, or the point for which may be recovered beyond reasonable doubt by the acts and testimony of the interested landowners, competent surveyors, other qualified local authorities, or witnesses, or by some acceptable record evidence.

\* \* \*

A lost corner is a point of a survey whose position cannot be determined, beyond reasonable doubt, either from traces of the original marks or from acceptable evidence or testimony that bears upon the original position, and whose location can be restored only by reference to one or more interdependent corners." U.S. Dept. of Interior, Bureau of Land Management, Manual of Instructions for the Survey of the Public Lands of the United States secs. 5—5, 5—9, 5—20, at 130, 133 (1973).

The direction in *Irvin* to establish lost corners by reference to known government corners requires, at a minimum, reference to an obliterated corner which is one whose location may be recovered beyond a reasonable doubt by the testimony of landowners, witnesses, or acceptable record evidence.

■ The testimony of the surveyor is silent on efforts to take the testimony of knowledgeable landowners. The record measure of the distance between the northeast and southeast section corners of section 12 is one chain longer than the distance between the stone corners. The record is also ambiguous as to the congruity between other calls in the field notes and the actual location of the section corners for section 12. While it is true the surveyor testified he attempted to locate this chain deficiency by proceeding north and south along the range line, the extent of his efforts was confined to one or two sections along the range line. In view of the importance of the reliance on these corners, we believe that a more diligent search is necessary either to find an original corner or to reestablish an obliterated corner with more certainty than was done here.

The parties have also raised two other issues in connection with the surveyor's methods which merit some consideration. As a result of the reliance by the surveyor on the section corners of section 12, the lost chain was carried over into the western boundary of section 7, making section 7 short 1.09 chains as compared to the original field notes. In view of our holding that the surveyor failed to locate the

lost quarter-corner by reference to a well-known government marker, we need not decide whether the surveyor was required to apportion the loss along the section line. We do note that this rule is followed both in Illinois case law and by other authorities. See *Martz v. Williams* (1873), 67 Ill. 306; *Nilson Brothers v. Kahn* (1924), 314 Ill. 275, 145 N.E. 340; *Littlejohn v. Fink* (1922), 109 Neb. 282, 190 N.W. 1020; Clark, Surveying and Boundaries sec. 233, at 273 (4th ed. 1976).

Petitioners have also included two sentences of argument in their brief complaining that the surveyor, in retracing the boundaries of the subject property, failed to establish true direction in locating the metes and bounds description. Not only have petitioners failed to present any elucidating discussion on this point, but no authorities are cited in their brief. We do not believe such practice adequately complies with Supreme Court Rule 341(e)(7) (87 Ill. 2d R. 341(e)(7)), and we treat the issue as waived. (See *Nicholl v. Scaletta* (1982), 104 Ill. App. 3d 642, 432 N.E.2d 1267.) We would note, in any event, that merely because a deed gives a call for north does not require the line to be run true north or astronomically north as petitioners seem to suggest. (*Brown v. McCaffrey* (1948), 143 Me. 221, 60 A.2d 792.) The surveyor explained that the lines of the tract were drawn to conform with the bearings of the section and quarter-section lines which were within a few minutes of true north, and we have been cited no authority nor discovered any which convinces us that the surveyor erred in this regard.

■ As an additional issue, the respondents have argued that the trial court should not have allowed the surveyor to be examined by the petitioners pursuant to section 60 of the Civil Practice Act (Ill. Rev. Stat. 1979, ch. 110, par. 60) and that his testimony should not be considered by this court. This issue is, however, not properly before this court, as the respondents did not file a notice of cross-appeal. It is well settled that where the appellee does not file a notice of cross-appeal, the appellate court is confined to the issues raised by the appellant. *Bean v. Norfolk & Western Ry. Co.* (1980), 84 Ill. App. 3d 395, 405 N.E.2d 418.

On April 19, 1982, the trial court entered an order directing that all statements of expenses of the surveyor were to be paid by petitioners. These expenses, including interest, now amount to approximately $11,552.79 as of April 1982. Petitioners have appealed this order and contend that the trial court erroneously directed that they bear all costs and expenses of the survey.

The statute governing the payment of the costs and expenses of the survey and suit provides, in part:

"The expenses and costs of the surveys and suit shall be apportioned among all the parties, according to their respective interests." Ill. Rev. Stat. 1979, ch. 133, par. 14.

There have been but three cases to interpret the phrase at issue: *Stevens v. Allman* (1873), 68 Ill. 245; *Faucher v. Tutewiller* (1875), 76 Ill. 194; and *McNeil v. Allen* (1917), 205 Ill. App. 199.

In *Stevens*, a petition was filed under the act as it existed in 1869 to establish the corners and boundaries between one Stevens and Allman and other parties. The first report was objected to by Stevens and Allman, and a resurvey was ordered. The second survey was accepted by the trial court and the court assessed the costs of the first survey against the objectors Stevens and Allman and ordered that Stevens pay the full cost of the second. A direct appeal was taken to the supreme court which reversed the apportionment of costs by the trial court. The opinion gave no clear guidance on the manner of determining the parties' respective interests, but noted:

"We perceive no reason why the letter of the statute should not be adhered to. The mode of apportionment is clearly expressed, and it seems to be entirely equitable.

The order of the circuit court, in relation to the payment of costs, is reversed, and the cause remanded, with directions to that court to apportion the costs among all the parties, according to their respective interests." (68 Ill. 245, 246.)

We believe that the holding of *Stevens* does not require an equal division of costs. Otherwise, we would think that the supreme court would have directed the trial court to equally divide the costs among all landowners. Rather, the instruction to the trial court was to divide the costs among the parties, according to their respective interests and not equally among all.

The second case to interpret the statute was *Faucher*. In *Faucher*, a petition was brought to ascertain the township line which divided one Tutewiller's land from land to the south owned by Nehemiah Faucher and Walter Ruffner. A third defendant, H. Faucher, was alleged to own land to the south but the opinion does not indicate whether in fact he owned land which was along the disputed area. Objections to the report were submitted by N. Faucher but they were overruled and the report accepted. The trial court assessed costs only against N. Faucher and W. Ruffner and, on appeal to the supreme court, the order assessing costs was affirmed. Objection was made that the court did not properly divide the expenses since only two of the three defendants were required to pay. There the court noted:

"The court found, upon the hearing, that of the defendants in

the court below, Nehemiah Faucher and Walter Ruffner alone were interested in the line, therefore it was proper to enter judgment against them alone." (76 Ill. 194, 197.)

It would seem clear from this decision that ownership of land is not paramount. If ownership of land was the interest referred to by the statute, then it would seem that both plaintiff and H. Faucher would have been required to pay since they apparently owned land adjacent to the disputed quarter. Rather, the supreme court indicated that the manner of allocating the costs depends upon a determination by the trial court of who is interested in the location of the line.

Finally, *McNeil* is the last reported decision considering the statute. There a petition for the appointment of a commission of surveyors was brought by McNeil against Allen to establish their common boundary. Allen did not appear, and a commission was appointed. Allen then filed objections to the commission's report but the objections were stricken and the report confirmed. The trial court assessed costs equally against both parties, and the appellate court affirmed. The opinion does not discuss the statute or give reasons for its conclusion.

By the very nature of the proceedings, all parties are benefited by the ascertainment of their disputed, destroyed, or lost boundaries by fixing their property rights and putting to an end potentially infinite disputes between them. While these considerations would seem to indicate that the parties have equal interests in the proceedings and should equally bear the costs, the evidence at bar indicates that petitioners have hired several surveyors to fix a boundary suitable to them and had previously brought an unsuccessful suit in ejectment against the respondents, while all along the respondents were willing to abide by the boundaries established in a survey made by one Oglesby who had been hired by petitioners to survey the area. In view of this evidence, we cannot say that the trial court erred in requiring petitioners to bear the costs of the survey. The evidence seems to us to indicate that petitioners alone were interested in the establishment of the disputed boundary.

Accordingly, for the foregoing reasons, the order of the trial court approving the survey is reversed, and the cause is remanded for proceedings not inconsistent with this opinion. The order of the trial court assessing the costs of the survey and the suit against petitioners is affirmed.

Affirmed in part; reversed in part; and remanded with directions.

WEBBER and TRAPP, JJ., concur.